No. 58,967

RANDY MORRISS and DEBRA WHITE, *Appellants*, v. COLEMAN
COMPANY, INC., RALPH CALL, and ROBERT SLOAN, *Appellees*.

(738 P.2d 841)

Opinion filed June 12, 1987.

*Stephen B. Plummer*, of Rumsey, Richey & Plummer, of Wichita, argued the cause and was on the briefs for appellants.

*William H. Dye*, of Foulston, Siefkin, Powers & Eberhardt, of Wichita, argued the cause, and *Jeffery A. Jordan*, of the same firm, was with him on the briefs for appellees.

*Dwight A. Corrin*, of Corrin & Krysl, Chartered, of Wichita, and *Jim L. Lawing*, of Wichita, were on the brief *amicus curiae* for Kansas Trial Lawyers Association.

*Stewart L. Entz*, of Entz, Anderson & Chanay, of Topeka, were on the brief *amicus curiae* for Kansas Chamber of Commerce and Industry.

The opinion of the court was delivered by

PRAGER, C.J.: This is an action brought for wrongful discharge by two former employees against the Coleman Company, Inc., of Wichita (Coleman) and two of its supervisors, Ralph Call and Robert Sloan. The two plaintiffs, Randy Morriss and Debra White, alleged in their petition that Coleman breached an im-

plied contract of employment: (1) By discharging them without good cause, and (2) by terminating their employment in bad faith, thus violating an implied covenant of good faith and fair dealing. The plaintiffs further alleged that the two supervisors, Call and Sloan, had tortiously interfered with their contract rights. In addition, the plaintiffs asserted three other tort claims against the defendants which have been abandoned on appeal. The district court granted the motion for summary judgment filed on behalf of all defendants. The plaintiffs appealed.

The Court of Appeals heard the case and, in an unpublished opinion No. 58,967 filed on November 26, 1986, reversed the trial court's order granting summary judgment for tortious interference and breach of implied contract in favor of the defendants. Both the plaintiffs and defendants filed petitions for review which were granted by this court on all issues raised in the Court of Appeals.

The rules to be applied by an appellate court in a case where summary judgment was granted by the trial court are well established. Summary judgment is proper only when the pleadings, affidavits, and the discovery record show there are no genuine issues of material fact, and that the moving party is entitled to judgment as a matter of law. *Lostutter v. Estate of Larkin,* 235 Kan. 154, 164, 679 P.2d 181 (1984). In reviewing a summary judgment, an appellate court must read the record in the light most favorable to the party who opposed the motion. *McAlister v. Atlantic Richfield Co.,* 233 Kan. 252, Syl. ¶ 4, 662 P.2d 1203 (1983). Thus, this court must give the plaintiffs the benefit of all favorable inferences arising from the record.

At the time the defendants' motion for summary judgment was granted, the plaintiffs through discovery had obtained documents and admissions from defendants and had taken a partial deposition of Robert Sloan. The depositions of both plaintiffs had also been taken, but a pretrial conference had not yet been held. The underlying circumstances of both plaintiffs' employment and termination are not in dispute although plaintiffs contend material issues of fact are still unresolved.

Viewing the evidentiary record in the light most favorable to the plaintiffs, the facts in the case before the trial court at the time of entry of summary judgment were as follows: The plain-

tiff, Debra White, was employed by Coleman in 1977 as a secretary. During her tenure, White received consistently favorable job performance evaluations and regular salary increases. Defendant Call told her she was the best secretary he had ever had and referred to her as an excellent secretary. At the time of her firing, White was the executive secretary to Call. The other plaintiff, Randy Morriss, was employed by Coleman as a production supervisor. Like White, Morriss also received consistently favorable job performance evaluations and salary increases. He was promoted to department manager and eventually to manufacturing engineer, the job he held when he was terminated in November of 1984. Morriss was married but separated from his wife at the time of his termination. The defendants concede that Morriss, as well as White, were good employees.

Robert Sloan was employed by Coleman in September 1965, and he has held various positions with the company. At the time plaintiffs were terminated, Sloan was factory manager at the "downtown" Coleman factory in Wichita. Morriss worked under Sloan, although Morriss' direct supervisor was Dan Jonker. Sloan in turn reported to Call. Thus, both White and Morriss worked under Call, but only White was directly supervised by him.

The Coleman Company is engaged in the business of manufacturing various types of recreational and outing products. Like most large companies, Coleman utilizes both formal and informal personnel policies and procedures. Supervisory personnel and representatives have disseminated these policies and made them known to their subordinates. According to Sloan, these "policies" state the "employee rights and responsibilities" and govern the conduct of both employer and employees.

There are three categories of Coleman employees:

(1) factory hourly employees, who work in the factory and are paid an hourly wage;

(2) office hourly employees, such as White, who work in clerical/secretarial positions; and

(3) monthly salaried employees, such as Morriss, who are principally supervisory employees.

Coleman disseminates to the factory hourly employees a personnel manual applicable to them. However, employees in the

latter two categories, including White and Morriss, are not issued individual copies of a personnel manual. Instead, they are governed by the rules and regulations set forth in a supervisor's manual which is disseminated only to supervisory employees. The rules and regulations in the manual are made known to affected employees by their immediate supervisor. In addition, according to Sloan, each supervisor is free to promulgate rules and regulations which apply only to his or her subordinates. Coleman, in both its employees' handbook and in its supervisor's manual, states without equivocation that its purpose is to ensure "fair and uniform treatment of all employees."

The manual, which is issued to the hourly factory employees states:

"The basic plan for us all is to build and sell quality products that people will be proud to own; to serve growing markets for the benefit of shareholders and employees; to emphasize productivity to gain an edge against competition; to strive for reasonably stable, safe, comfortable, and efficient working conditions; and receive fair treatment, wages, and benefits."

In the manual, it is stated that factory employees are entitled to receive respectful, honest, and fair treatment from supervisory employees; to have an opportunity to build a career with a company that values increasing skills, experience, and loyalty; to have an opportunity to contribute their ideas, problems, and complaints in effective ways; and to work with a company whose products, policies, and practices they can respect and thereby be proud to contribute their talents and their efforts. The manual stresses the team concept and contains a section governing disciplinary actions. That section states:

"Any group of people needs a set of rules to work and live by. These rules need to be simply stated, consistently applied; and there needs to be a system to provide, where necessary, interpretation and resolution of disputes."

It states that, since no one is perfect, disciplinary action is merited at times. The section then sets forth the procedure for disciplinary action by written notice, suspension, or discharge. It states that a written reprimand will be used first unless the facts or circumstances warrant suspension or discharge. Whenever an employee with seniority status is to be discharged, he or she shall first be suspended without pay for not more than five work days and notified in writing on the reprimand form that dis-

charge will occur at the end of the suspension period. If an employee feels that he or she has been improperly disciplined, then he or she may initiate a complaint in writing through the Employee Relations Counselor and action may be taken to reduce or rescind a suspension or discharge. A number of specific violations are set forth which may result in suspension or discharge. Certain violations of the rules are to result in immediate discharge. The clear implication from the factory employees' manual is that Coleman and its employees are all working together and the rights of all will be respected.

The supervisor's manual, which is applicable to nonfactory employees such as Morriss and White, states that its purpose is to ensure fair and uniform treatment of all employees. This manual is in the form of a number of bulletins that are issued from time to time and which apparently are not distributed to the individual employees but only to the supervisors who in turn are required to communicate the contents to the employees. The introduction to the supervisor's manual states: "[I]t is essential that we all, employees and supervision, have a thorough understanding of the policies of the Company and work together in harmony in the best interests of all."

Bulletin No. 38 states that Coleman will only discharge its employees for good cause, and Sloan admitted that this is, in fact, Coleman's policy. Sloan stated that, in practice, this means that Coleman only discharges employees if a good reason exists. He also testified that an employee is normally warned of a performance deficiency and is permitted to take corrective action before being discharged. The only exception is a situation where an employee flagrantly violates company rules in a manner where corrective measures are neither feasible nor warranted. Morriss testified that, as a supervisor, he regularly utilized the personnel manual and was well aware of the company's policy of terminating employees only for good cause. White also testified that she knew of the "good cause" termination policy and the company's policy of resorting to termination only after other measures had failed.

Other provisions of the supervisor's manual referred to Coleman's "constant and conscientious effort to see that all of its employees are treated with consideration and fairness" and also

stated various actions which may constitute grounds for termination. For instance, an employee's off-duty conduct is not grounds for termination except under certain specified conditions. On the other hand, other specific conduct or action will result in termination or discipline.

In the supervisor's manual there is a paragraph which states one of its purposes is as follows:

"To provide all of us as Coleman employees of the Company, through written reference, a better understanding of our privileges and obligations which are an inherent part of our employment. *Nothing in this policy manual should be construed as an employment contract or guarantee of employment.*" (Emphasis supplied.)

The defendants, both in the trial court and on this appeal, relied very heavily on the last sentence just stated to sustain their position that Coleman had the right to fire the plaintiffs at any time with or without cause.

The facts surrounding the termination of Morriss and White are undisputed at this time. Coleman allows management to purchase company cars, and Call was entitled to receive the next available company car. Unfortunately for Call, the next car was located in Greenville, South Carolina, and he had to persuade someone to retrieve his vehicle. White advised Morriss of Call's personal dilemma. Morriss was interested in making the trip, and White so advised Call, who readily agreed. Without first consulting Morriss, Call told White to make plane reservations for Morriss for the following Tuesday morning. However, Morriss had a conflict in a night class at Wichita State University, and Call agreed that Morriss could leave on Wednesday instead. In addition, Morriss requested to take an extra travel day. Call approved the travel plans for Morriss.

The South Carolina trip was scheduled when the factory was to be shut down for inventory. Thus, neither plaintiff expected to work after Wednesday. White and Morris discussed the possibility of traveling together, and, late Tuesday, White decided to go along. White took the day off on Wednesday as she was entitled to do, but did not tell Call what she intended to do. The couple then flew out of Wichita on Wednesday morning without telling anyone except a friend of Morriss's. White paid her own

expenses. Both plaintiffs believed the trip was strictly a private matter.

Unknown to Morriss and White, Sloan suspected that something was amiss. Sloan expressed those suspicions to Call. Call did not request Sloan to investigate; however, Sloan then took the initiative and requested the Director of Security to verify whether Morriss and White left for South Carolina together. The investigator reported back to Sloan that Morriss and White had, in fact, flown out of the airport together. Armed with that information, Sloan relayed his findings to Call. Call telephoned White's mother and he was told she did not know where her daughter was. Without any further information at his disposal, Call decided to terminate Morriss and White. He did not attempt to contact his employees in South Carolina; rather, he terminated them after they had delivered his car to Wichita. Both plaintiffs immediately met with Call to learn why they had been terminated. Call only said he could not articulate the reasons; he did not say that no reason was needed. The plaintiffs then met with Sheldon Coleman, Jr., who refused to countermand Call's decision because Mr. Coleman was new on the job. Call ultimately explained that he had terminated the plaintiffs for "dishonesty," "breach of trust," and "for increasing the company's insurance liability." Throughout this litigation, Coleman has never argued that the plaintiffs were terminated for good cause. Coleman only takes the position that the employees were employees at will and could be terminated at any time for good or bad cause or for no cause at all.

There is evidence in the record which would indicate that Call had strong religious beliefs and values, and was a very difficult supervisor to work for, and that he terminated plaintiffs simply because he disapproved of their taking a trip together without being married.

In his deposition, Sloan testified as to his conversation with Call when the decision to terminate was made. Sloan testified that, in his judgment, it would not have been grounds for termination if Morriss had taken his wife or a male employee without clearing it with his employer. Although this matter has not been determined by the trier of fact, a reasonable person might be led to conclude that the plaintiffs were terminated simply because Call did not think that a married man and an unmarried woman

had any business traveling together on an airplane trip to another city. The evidence was undisputed that both White and Morriss were considered to be good employees who received regular promotions and were apparently well thought of by their supervisors. In the event of a trial of this case, the defendants would have been provided an opportunity to introduce evidence to the contrary and to show the reason or cause for the plaintiffs' termination.

In granting summary judgment, the district court concluded, as a matter of law, that Morriss and White had no fixed term of employment and, because they were employees at will, they could be terminated at any time for any reason or for no reason. The trial court found that there was no implied contract of employment of the plaintiffs with Coleman and that the termination did not violate any clear statutory policy established to deal with the employment-at-will doctrine. Stated simply, the trial court found that, because the plaintiffs were employees at will and there was no express or implied contract covering the duration of their employment, the defendants were entitled to summary judgment as a matter of law on the plaintiffs' claim for a breach of contract. Likewise, the trial court granted summary judgment on the plaintiffs' claim of tortious interference as against the defendants Call and Sloan, as well as other tort claims.

In order to determine this appeal, it would be helpful at the outset to examine the employment-at-will doctrine as traditionally applied in Kansas and other jurisdictions. Under the American common law an employer may discharge his "at-will employee" for good cause, for no cause, or even for a wrong cause, without incurring liability to the employee for wrongful discharge. This unbridled freedom has been relied on by courts down through the years to disallow a cause of action by an employee based upon wrongful discharge. This employer latitude is said to be reenforced by the principle of mutuality of obligations. If the employee is free to quit at any time, then the employer must be free to dismiss at any time. The termination-at-will doctrine, although generally applied by the courts throughout the United States, has recently been severely criticized by legal scholars and the courts.

Some courts have refused to adhere to the traditional rule, finding little cause to recommend its continued application in instances in which the employer's conduct undermines an important public policy. Federal and state legislation has been enacted which is designed to restrict an employer's ability to terminate a worker arbitrarily. Although no court has entirely abolished the employment-at-will doctrine in court decisions, the cases throughout the United States indicate a trend to avoid the injustice of the rule. State courts have recognized causes of action based on the theories of wrongful discharge, violation of public policy, and breach of contract.

One method commonly used by the courts is to interpret employment contracts more broadly and to recognize an implied obligation on the part of the employer not to terminate an employee arbitrarily where a policy or program of the employer, either express or implied, restricts the employer's right of termination at will. For example, some courts have relied on employee manual guidelines which set out the grounds and procedures for discharge in cases where the discharged employee claims that those policies have become part of the employment contract, thus barring the employer from violating its own policies in discharging an employee. This exception is based on an implied contract theory.

Another exception to the termination-at-will doctrine has been recognized by some courts in suits of a tort nature for retaliatory discharge based on the theory that dismissal of employees for reasons violative of a particular public policy should be actionable, although other courts have expressly declined to recognize such a limitation on the employer's right of termination. A variety of motives for dismissal on the part of employers has been advanced by disgruntled employees as so violative of public policy as to give rise to such a cause of action: Retaliation for the employee's opposition to illegal or unethical activities of the employer; retaliation for filing workers' compensation claims; retaliation for exercise of rights under labor-management relations statutes; penalizing the employee for refusal to take a polygraph examination; penalizing the employee for taking time to serve on jury duty; and various other violations of alleged public policy interests.

In more recent years, some courts have adopted an exception that a termination of an at-will employee, not founded in good faith or just cause, violates an implied covenant of good faith and fair dealing in the performance and enforcement of every contract. This exception is based upon the theory that parties to contracts and commercial transactions must act in good faith toward one another. Some of the states have adopted the rule that good faith is assumed or implied in every contract, including employment contracts.

These various exceptions to the termination-at-will doctrine are discussed in comprehensive annotations at 12 A.L.R.4th 544 and 33 A.L.R.4th 120.

The history of the employment-at-will doctrine in Kansas is quite comparable to that in other states. Historically, the Kansas courts have adhered to the traditional employment-at-will doctrine. In *Swart v. Huston*, 154 Kan. 182, 117 P.2d 576 (1941), it was held that, in the absence of an express or implied contract between an employee and his employer covering the duration of such employment, no action for discharging the employee from service can be maintained against the employer. The court based this holding on a theory of mutuality, noting that the plaintiff employee was privileged to quit whenever he chose, and conversely, the defendant employer could therefore discharge the employee at any time without being penalized for doing so.

In *Johnson v. National Beef Packing Co.*, 220 Kan. 52, 551 P.2d 779 (1976), this court followed the general rule, holding that, in the absence of a contract, express or implied, between an employee and his employer covering the duration of employment, the employment is terminable at the will of either party, and the employee states no cause of action for breach of contract by alleging that he has been discharged.

The court quoted from 53 Am. Jur. 2d, Master and Servant § 27, p. 103, which states as follows:

"Where no definite term of employment is expressed, the duration of employment depends on the intention of the parties as determined by circumstances in each particular case. The understanding and intent of the parties is to be ascertained from their written or oral negotiations, the usages of business, the situation and object of the parties, the nature of the employment, and all the circumstances surrounding the transaction."

In *Johnson*, the court used language that rejected the notion that a company policy or personnel manual may constitute an express contract of employment or serve as a basis for establishing a contract of employment by implication. A statement in the employer's company policy manual provided to plaintiff several months after his initial hiring noted specifically that no employee shall be dismissed without just cause. The court concluded that the terms of the personnel manual could not be construed to mean a fixed or definite period of employment, nor could an implied contract be inferred.

Despite this strict adherence to the employment-at-will doctrine in *Johnson*, the Kansas appellate courts in more recent cases have noted the development of various theories in other jurisdictions which have led to the erosion of the doctrine. In *Murphy v. City of Topeka*, 6 Kan. App. 2d 488, 630 P.2d 186 (1981), the Court of Appeals took a step away from the strict application of the traditional rule and toward recognizing causes of action in tort for wrongful discharge. In *Murphy*, the plaintiff was employed by the City of Topeka and, after sustaining injuries on the job, filed a workers' compensation claim as authorized by statute. Murphy was offered further employment only on the condition that he withdraw his compensation claim. When Murphy refused, his employment was terminated. The Court of Appeals, after an analysis of the public policy underlying the workers' compensation act, held that the discharge of an employee in retaliation for filing a workers' compensation claim is actionable at law and may support an award of both actual and punitive damages. *Murphy* is important because it opened the way to judicial recognition of a variety of public policy considerations which could support actions for tortious retaliatory discharges.

In *Cain v. Kansas Corporation Commission*, 9 Kan. App. 2d 100, 673 P.2d 451 (1983), the plaintiff Cain brought an action against the KCC seeking damages for breach of contract and retaliatory discharge. The court recognized that the tort of retaliatory discharge recently had become a part of the Kansas judicial process. The court stated that the tort of retaliatory discharge is an exception to and in mitigation of the principle that an at-will

employee can be terminated at any time, with or without cause, but that the remedy is available mostly where the discharge seriously contravenes a very clear public policy. Under the factual circumstances presented, however, the court in *Cain* upheld the decision of the district court denying plaintiff's claim for breach of his employment contract and for retaliatory discharge.

The next case on the subject is *Allegri v. Providence-St. Margaret Health Center*, 9 Kan. App. 2d 659, 684 P.2d 1031 (1984), where Syllabus ¶ 4 states:

"In the absence of a contract, express or implied, between an employee and his employer covering the duration of his employment, the employment is terminable at the will of either party, and the employee states no cause of action for breach of contract by alleging that he has been discharged. (Following *Johnson v. National Beef Packing Co.*, 220 Kan. 52, 54, 551 P.2d 779 [1976].)"

In *Allegri*, the plaintiff alleged that he had an implied-in-fact contract with the defendant employer with terms defined by the parties' course of dealing and the employee handbook's progressive discipline policy which led plaintiff to believe he could be terminated only "for cause." Although not relying completely on the terms of the handbook, the court concluded that sufficient factual issues remained unresolved to foreclose summary judgment. *Allegri* is important because it established clearly the rule that intent of the contracting parties is normally a question of fact for the jury and that the determination of whether there is an implied contract in employment requires a factual inquiry. The court placed a great deal of emphasis on the provisions of the employees' handbook and communications and discussions between the plaintiff and his supervisors. The court in the last paragraph of the opinion at 664 noted that "in proper circumstances an employee at will (*i.e.*, without a contract for a specific duration) may bring a tort action for *retaliatory discharge* when the termination is based on retaliation constituting a contravention of public policy. [Citations omitted.] An action for wrongful discharge, as that term is generally used, alleges breach of an employment contract and, obviously, requires proof of the existence of such a contract."

Our most recent case on the subject is *Anco Constr. Co. v. Freeman*, 236 Kan. 626, 693 P.2d 1183 (1985), where this court

again recognized the employment-at-will doctrine and then cited *Murphy v. City of Topeka*, 6 Kan. App. 2d 488, as requiring a limited public policy exception to the doctrine. It was held that, when an employee is terminated in violation of federal public policy, no state cause of action is pled, and that the National Labor Relations Board had exclusive jurisdiction over the plaintiff's claim.

In the case now before us, the plaintiffs maintain that the trial court erred in entering summary judgment in favor of the defendants because there was a genuine issue of fact as to whether or not their employment had been terminated in violation of an implied contract that an employee would not be terminated by the Coleman Company except for good cause under circumstances similar to those in *Allegri v. Providence-St. Margaret Health Center*, 9 Kan. App. 2d 659. The plaintiffs rely not only on the statements contained in the personnel manuals but also on the basis of verbal and nonverbal conduct of the Coleman supervisors and Coleman's established policies in dealing with its employees. The defendants rely to a great extent on the paragraph in the supervisor's manual quoted earlier in the opinion to the effect that "nothing in this policy manual should be construed as an employment contract or guarantee of employment." The Court of Appeals in its opinion considered the provisions in the manual along with the conduct of the parties and concluded that the evidence developed at the time summary judgment was granted was sufficient to require the denying of defendants' motion for summary judgment. In reaching that conclusion, the Court of Appeals followed the rule stated in Syllabus ¶ 5 of *Allegri*, which states:

"Where it is alleged that an employment contract is one to be based upon the theory of 'implied in fact,' the understanding and intent of the parties is to be ascertained from several factors which include written or oral negotiations, the conduct of the parties from the commencement of the employment relationship, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment, and any other circumstances surrounding the employment relationship which would tend to explain or make clear the intention of the parties at the time said employment commenced."

The majority of this court has considered the entire record in this case and concluded that there was a legitimate issue of fact

whether there was an implied contract by Coleman to treat its employees fairly and in good faith and that an employee would not be terminated except for just cause.

The disclaimer in the supervisor's manual quoted above does not as a matter of law determine the issue. It has not been established that the disclaimer was brought to the personal attention of its employees or that it was intended by Coleman to create an unqualified employment-at-will relationship, especially in view of other provisions in the manual and the statements made by Coleman's supervisors to the employees. There has been no trial in this case, and we only hold that the evidence presented in the record at the time summary judgment was granted was insufficient to require summary judgment in favor of defendants as a matter of law. The ultimate decision of whether there was an implied contract not to terminate the plaintiffs without just cause must be determined from all the evidence presented by the parties on that issue. We thus hold that the trial court erred in sustaining the defendants' motion for summary judgment as to that implied contract claim.

In addition to the implied contract argument, plaintiffs also contend the defendants breached an implied convenant of good faith and fair dealing, thus entitling the plaintiffs to recover either in tort or in contract. The implied covenant of good faith and fair dealing is stated in Restatement (Second) of Contracts § 205 (1979), in the following language:

"§ 205. **Duty of Good Faith and Fair Dealing**

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."

The comment under § 205 of the Restatement declares that good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving "bad faith" because they violate community standards of decency, fairness, or reasonableness.

Although the implied covenant of good faith and fair dealing has not been specifically recognized by this court in the area of termination of employment contracts, it has been recognized in other areas of contract law. K.S.A. 84-1-203, which is a part of the

Uniform Commercial Code, provides that "[e]very contract or duty within this act imposes an obligation of good faith in its performance or enforcement." In the official UCC comment to that statute, it is stated that the principle involved is that in commercial transactions good faith is required in the enforcement and performance of any duty. The concept is broad and applies generally to the performance or enforcement of every contract or duty within the act.

It is further stated that the obligation of good faith has been a part of commercial transactions in the past. The term "good faith" is defined in K.S.A. 1986 Supp. 84-1-201(19) to mean "honesty in fact in the conduct or transaction concerned."

In recent years, a number of state jurisdictions have adopted and applied the implied covenant of good faith and fair dealing to a terminable-at-will employment contract. In *Monge v. Beebe Rubber Co.*, 114 N.H. 130, 316 A.2d 549 (1974), the Supreme Court of New Hampshire held that in all employment contracts, whether at will or for a definite term, the employer's interest in running his business as he sees fit must be balanced against the interests of the employee in maintaining his employment, and the public's interest in maintaining a proper balance between the two. It further held that a termination by the employer of an employment-at-will contract is not in the best interest of the economic system or the public good where such termination is motivated by bad faith or malice or based on retaliation. However, the rule does not interfere with the employer's normal exercise of his right to discharge, which is necessary to permit him to operate his business efficiently and profitably.

In *Fortune v. National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251 (1977), the controlling issue on appeal was whether a bad faith termination of an employee constituted a breach of an at-will employment contract. The Supreme Court of Massachusetts recognized that traditionally an employment contract which is "at will" may be terminated by either side without reason. The written contract between the parties reserved to the parties the explicit right to terminate the contract without written notice. The court stated that it did not question the general principles that an employer must have wide latitude in deciding whom it will employ and that an employer needs leeway in employing

employees. The court recognized the employer's need for flexi-bility in the face of changing circumstances and for a large amount of control over its work force. However, the employer's decision to terminate its at-will employee should be made in good faith. The court stated that good faith and fair dealings between parties are pervasive requirements in our law, and it can be said fairly that parties to contracts or commercial transactions are bound by this standard.

The Supreme Court of Oklahoma recently applied the implied covenant of good faith to a termination of an at-will contract between an insurance company and its general agent. In *Hall v. Farmers Ins. Exchange*, 713 P.2d 1027 (Okla. 1985), the Supreme Court of Oklahoma, relying primarily upon *Monge* and *Fortune*, held that the implied covenant of good faith extends to a covenant not to wrongfully resort to a termination-at-will clause.

The court stated in the opinion as follows:

"This court has long recognized that parties should be free to contract for any lawful purpose upon such terms and conditions as they believe to be in their mutual interest. Such freedom is not absolute however, and the interests of the people of Oklahoma are not best served by a marketplace of cut-throat business dealings where the law of the jungle is thinly clad in contractual lace.

"In this spirit, we have recognized, as have many jurisdictions, that each contract carries an implicit and material covenant by the parties to act toward each other in good faith." 713 P.2d at 1029.

Although not all inclusive, recent cases from other jurisdictions adopting the implied covenant of good faith and fair dealing in employment-at-will contracts include:

Alaska:   *Knight v. American Guard & Alert, Inc.*, 714 P.2d 788 (Alaska 1986).

California:  *Koehrer v. Superior Court*, 181 Cal. App. 3d 1155, 226 Cal. Rptr. 820 (1986); *Gray v. Superior Court*, 181 Cal. App. 3d 813, 226 Cal. Rptr. 570 (1986).

Massachusetts: *Fortune v. National Cash Register Co.*, 373 Mass. 96, 364 N.E.2d 1251 (1977).

Montana:  *Crenshaw v. Bozeman Deaconess Hosp.*, 213 Mont. 488, 693 P.2d 487 (1984); *Flanigan v. Prudential Federal Sav. & Loan*, _____ Mont. _____, 720 P.2d 257 (1986).

New Hampshire: *Cilley v. N.H. Ball Bearings, Inc.*, 128 N.H. 401, 514 A.2d 818 (1986); *Howard v. Dorr Woolen Company*, 120 N.H. 295, 414 A.2d 1273 (1980); *Monge v. Beebe Rubber Co.*, 114 N.H. 130, 316 A.2d 549 (1974).

Oklahoma: *Hall v. Farmers Ins. Exchange*, 713 P.2d 1027 (Okla. 1986); *Grayson v. American Airlines, Inc.*, 803 F.2d 1097 (10th Cir. 1986).

Texas: *Ramos v. Henry C. Beck Co.*, 711 S.W.2d 331 (Tex. App. Dallas 1986).

Virgin Islands *Petersen v. First Federal Sav. & Loan Ass'n of P. R.*, 617 F. Supp. 1039 (St. Croix D.V.I. 1985).

Likewise, recent cases from jurisdictions rejecting the implied covenant of good faith and fair dealing in the context of employment-at-will include:

Colorado: *Pittman v. Larson Distributing Co.*, 724 P.2d 1379 (Colo. App. 1986).

Connecticut: *Magnan v. Anaconda Industries, Inc.*, 193 Conn. 558, 479 A.2d 781 (1984).

District of Columbia: *Minihan v. American Pharmaceutical Ass'n*, 812 F.2d 726 (D.C. Cir. 1987).

Illinois: *Scott v. Sears, Roebuck & Co.*, 798 F.2d 210 (7th Cir. 1986).

Indiana: *Hostettler v. Pioneer Hi-Bred Intern., Inc.*, 624 F. Supp. 169 (S.D. Ind. 1985).

Louisiana: *Frichter v. National Life & Acc. Ins. Co.*, 620 F. Supp. 922 (E.D. La. 1985).

Maryland: *Borowski v. Vitro Corp.*, 634 F. Supp. 252 (D. Md. 1986).

Minnesota: *Dumas v. Kessler & Maguire Funeral Home*, 380 N.W.2d 544 (Minn. App. 1986).

Nebraska: *Jeffers v. Bishop Clarkson Memorial Hosp.*, 222 Neb. 829, 387 N.W.2d 692 (1986).

New Mexico: *Salazar v. Furr's Inc.*, 629 F. Supp. 1403 (D.N.M. 1986).

Kansas cases have recognized the requirement of good faith in cases involving construction contracts where the parties have

agreed that a certain individual, as an umpire, shall have the final decision on any dispute that might arise between the parties to the agreement.

In *Edwards v. Hartshorn,* 72 Kan. 19, 82 Pac. 520 (1905), there was a provision in a contract between a contractor and subcontractor for the grading of a railroad that the work should be done under the supervision of the chief engineer of the former, who should make estimates as a basis for the payment of the work done, and that his decision as to all matters of dispute between the parties should be final and conclusive. It was held that such a decision is prima facie conclusive upon all matters submitted to the umpire and fairly and honestly decided by him. However, if there be fraud or mistake so great and palpable as to imply bad faith, or the umpire fails fairly and honestly to perform the function assigned to him, his decision will have no binding force.

Likewise, in *Wilson v. Drainage District,* 113 Kan. 82, 213 Pac. 635 (1923), it was held that it is competent for the parties to a contract to agree that the finding of an engineer or other designated person upon the quantity and character of work done shall be conclusive, in which case the finding can only be impeached for *bad faith* or what amounts to that.

After a careful consideration of these various cases, pro and con, the majority of the court has concluded that the principle of law stated in Restatement (Second) of Contracts § 205, that every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement, is overly broad and should not be applicable to employment-at-will contracts.

As to the claim asserted against the defendants Call and Sloan for tortious interference, we agree with the Court of Appeals that the factual circumstances must be more fully developed before the issue of liability or nonliability can be determined. Summary judgment was prematurely entered by the trial court and the case is reversed on that issue.

The judgment of the district court is reversed and the case is remanded for further proceedings in accordance with the views expressed in this opinion. The judgment of the Court of Appeals is affirmed.

HERD, J., concurring: I concur in the result reached by the majority but I think we should expressly adopt Restatement

(Second) of Contracts § 205 (1979), which imposes a duty of good faith and fair dealing in the performance and enforcement of every contract including employment-at-will contracts. Employment contracts are the most sensitive of all contracts. They determine the standard of living and the quality of education for children, and affect the general welfare of all the people in this country. It is ludicrous that the covenant of good faith and fair dealing has been adopted pertaining to commercial transactions (see K.S.A. 84-1-203) but has not been adopted for transactions involving human working conditions.

The doctrine of employment-at-will and termination without cause is a carry-over from 19th Century laissez faire economic philosophy as expressed by Herbert Spencer in his works on economic Darwinism (survival of the fittest). After *Lochner v. New York*, 198 U.S. 45, 49 L. Ed. 937, 25 S. Ct. 539 (1905), we recognized that the individual laborer and management did not occupy equal bargaining positions. As a result, wage payment, prevailing wage, collective bargaining, workers' compensation, unemployment compensation, full employment, and many other laws were enacted making all labor contracts subject to them. Thus, we see the doctrine of employment-at-will and termination without cause is not absolute. Termination from such contracts for reasons of race, religion, and alienage violates the Fourteenth Amendment of the United States Constitution. We also recognize that discharge of a worker from an employment-at-will contract in retaliation for filing a workers' compensation claim violates public policy and is therefore unlawful. *Murphy v. City of Topeka*, 6 Kan. App. 2d 488, 630 P.2d 186 (1981). All the foregoing exceptions to the termination-at-will doctrine are bad faith discharges since they had nothing to do with the worker's job performance or the employer's employment needs. Such is also the case here. Coleman acquiesced in the actions of its supervisory employees in discharging appellants in retaliation for their off-duty conduct—conduct which apparently deviated from one supervisor's private code of morality. For the law to permit such vindictive retaliation is improper and has broad ramifications. Such terminations are in bad faith and violate the covenant of fair dealing. I respectfully submit we should adopt Restatement (Second) of Contracts § 205 (1979), making a duty

of good faith and fair dealing applicable in the performance and enforcement of all contracts.

PRAGER, C.J., joins in the concurring opinion of HERD, J., that the court should adopt the implied covenant of good faith and fair dealing set forth in Restatement (Second) of Contracts § 205.