FILED
United States Court of Appeals
Tenth Circuit

June 15, 2010

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

JEFFREY ABBOTT,

     Plaintiff - Appellant,

v.

BNSF RAILWAY COMPANY,

     Defendant - Appellee.

No. 09-3200
(D.C. No. 2:07-CV-02441-EFM)
(D. Kan.)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE,** Chief Judge, **HOLLOWAY** and **HENRY**, Circuit Judges.

Plaintiff-Appellant Abbott brought suit in state court against his employer,
Defendant-Appellee BNSF Railway Company, alleging retaliatory discharge in violation
of public policy and breach of contract. Defendant removed the case to federal court
asserting diversity of citizenship and claiming federal question jurisdiction on the basis
that Plaintiff's claims were pre-empted by the Federal Railroad Safety Act.[1]

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. This court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

[1] Complete diversity of citizenship appears to exist. Thus, we have no need to
address Defendant's argument for removal jurisdiction based on its defense of
preemption.

The federal district court granted Defendant's motion to dismiss the claim for wrongful discharge in violation of Kansas public policy, holding that claim was preempted by the Federal Railroad Safety Act. A second order of the district court granted Defendant's motion for summary judgment on the breach of contract termination claim. Plaintiff then brought this timely appeal.

**I**

Plaintiff began working for Defendant in 1979. In April 2006 he took the exempt position of general director of railroad training services at Defendant's technical training center. Prior to that he had been a director of the training center. With the promotion to general director, he took on responsibility for additional groups of employees.

Also in April 2006, Mr. Abbott learned of an incident that involved a serious breach of, at least, company policy and possibly a violation of law. An assistant vice-president of BNSF had maintained his license as a railroad engineer. The license had to be periodically renewed, and the vice-president needed to complete a certification test at that time. The test – or a part of it, the record isn't clear – involved a computer simulation exercise. On a Sunday, another employee went into the office, covered the lens of a security camera, and logged into a computer so that he could take the test for the first employee.

Although Mr. Abbott was not the first to learn of this incident, it was apparently his report of the incident to his supervisor that resulted in it being reported to senior officers of the company. The company investigated, and eventually the two employees

admitted the deception.  The vice-president was allowed to retire without any mention in his personnel file of the improper behavior.  The second employee's position on the salary schedule was lowered one grade, which did not impact his salary immediately but did apparently have some effect on his total compensation.

This incident of misconduct by others is significant in this appeal because Mr. Abbott alleged in commencing his lawsuit against BNSF that he had been discharged in retaliation for his role in bringing the incident to light.[2]  Whether the lawsuit can be maintained on that premise is the second issue discussed *infra.*

In August 2006, anonymous e-mails were sent to upper management complaining about Mr. Abbott's performance as general director.  BNSF looked into the complaints, conducting a "climate assessment" in September 2006.  As a result of this assessment, senior officials of BNSF learned that the staff of the technical training center appeared to be split, with about seventy per cent supporting Mr. Abbott and the rest unhappy with his performance.

Mr. Abbott was in Ft. Worth on October 19, 2006, where he met with some senior officials of BNSF.  He was put on a 30-day plan for improvement.  The parties dispute whether he was told that his job was in jeopardy, *i.e.,* whether he was in danger of being fired, but even by Mr. Abbott's account he realized that his position as general director

---

[2]This case is rather unusual in that Mr. Abbott sues for wrongful discharge from employment when in fact he is still employed by BNSF, as discussed in the text *infra*.  At times herein we may refer, as Mr. Abbott does, to his having been terminated or fired.  As the issues are presented to us, we need not be precise in describing the adverse employment action.

-3-

was in jeopardy and that he might be demoted if it was perceived that his performance did not improve. The thirty-day plan was not put in writing.

Mr. Abbott enrolled in a leadership class in an effort to improve his performance. He also made an effort to repair relations with some of the employees that he knew were displeased, including directly apologizing to one of them. Apparently Mr. Abbott's efforts were not enough to correct the situation, as he recognized that in December the two groups remained divided.

Abbott had received excellent performance reviews in positions he held prior to the April 2006 promotion to general director of the technical training center. Mr. Abbott's immediate supervisor, Mr. Hobbs, evaluated Abbott's performance as of the end of 2006, and in January 2007 Abbott received that report. Mr. Hobbs, who seems to have consistently been a supporter of Mr. Abbott, included several encouraging remarks in the report, but the overall rating was "needs improvement." In his comments, Mr. Hobbs said that Mr. Abbott still had "our" support and "I am convinced you are the right person for the job." An employee who received a "needs improvement" rating at BNSF could be placed on a performance improvement plan, but that did not happen in the case of Mr. Abbott.

On February 20, 2007, Mr. Abbott was notified that he was removed from the general director position and could only remain employed with BNSF if he exercised his seniority rights as a union member to claim a position as locomotive engineer. Mr. Abbott took the option of staying with the railroad as an engineer. The position of

locomotive engineer is an hourly, non-exempt position. As director, then general director, of the training center Mr. Abbott had been in an exempt, salaried position.

## II

Mr. Abbott raises two issues on appeal. He contends that the district court erred in dismissing his claim of retaliatory discharge in violation of public policy and in granting summary judgment for BNSF on his claim of breach of contract.

## A

In his first claim for relief Mr. Abbott alleged that he had been discharged in retaliation for having reported the misconduct of the two employees involved in the licensing test incident and that discharging him for this reason was a violation of the public policy of Kansas. The district court granted BNSF's motion to dismiss this claim, holding that the claim was preempted by the Federal Railroad Safety Act (FRSA), 49 U.S.C. §§ 20101 *et seq*. We review the district court's holding *de novo*. *See Thomas v. National Ass'n of Letter Carriers*, 225 F.3d 1149, 1157 (10th Cir. 2000).

The FRSA includes protection for "whistle-blowers" and provides an administrative remedy for employees who allege that they have been discharged or otherwise punished in violation of that policy of protection. At the time of the events involved in this appeal,[3] that administrative remedy was exclusive, the district court held,

---

[3]The current version of the FRSA does not preempt such state law claims. *See* 49 U.S.C. § 20109(g). In the district court, Abbott argued that the amended statute, which does not preempt state law actions, should be applied retroactively to his claim. The district court rejected that argument, and Abbott does not raise it on appeal. Therefore, we apply the statute as it was at the time of Abbott's discharge and consider only whether

preempting any state law remedies, such as the one Abbott seeks here.

Abbott makes a single argument in urging reversal of the district court's preemption ruling. He contends that *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246 (1994), holds that his claim is not preempted. In *Hawaiian Airlines*, the Court held that an airline mechanic's claim of wrongful discharge was not preempted by the Railway Labor Act. Abbott argues that this holding under a different act applies here because all disputes under the FRSA are subject to the administrative procedures of the Railway Labor Act. *See* 49 U.S.C. § 20109(d).

We are not persuaded. The FRSA adopts only the dispute resolution procedures of the Railway Labor Act. The relevant section, as of the relevant time, provided in pertinent part that a "dispute, grievance, or claim arising under this section is subject to resolution under section 3 of the Railway Labor Act (45 U.S.C. § 153)." 49 U.S.C. § 20109(c) (2000). The preemption provisions of the Railway Labor Act are not mentioned, much less incorporated, in the FRSA. Nor does *Hawaiian Airlines* provide any support for the proposition that the scope of preemption is the same under the FRSA as under the Railway Labor Act.

The Supreme Court's analysis in *Hawaiian Airlines* was centered on the question whether the plaintiff employee's claim in that case was a "minor dispute" under the applicable collective bargaining agreement. The Court held that the employee's state law claim in that case was not preempted because he sought to enforce "rights and obligations

that earlier version of the statute preempted Abbott's claim.

-6-

that exist[ed] independent" of the applicable collective bargaining agreement. 512 U.S. at 260. The Court further noted that the preemption standard under the Railway Labor Act was "virtually identical" to the standard that had been developed under the Labor Management Relations Act. *Id.* And the purpose of preemption under those acts is to ensure "that federal law will be the basis for interpreting collective-bargaining agreements . . . ." *Id.* at 262 (quoting *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 409 (1988)).

The Railway Labor Act and the FRSA have very different purposes. It is not surprising, then, that the preemption provisions of the two acts were intended to operate differently. *Hawaiian Airlines* simply provides no support for Abbott's contention that state-law wrongful discharge claims related to the policy of promoting railroad safety were not preempted under the FRSA as it was in force at the relevant time.

The issue apparently has not arisen frequently. The leading case, on which the district court relied in granting BNSF's motion, is *Rayner v. Smirl*, 873 F.2d 60, 65 (4th Cir. 1989). Preemption is a question of congressional intent. *Hawaiian Airlines*, 512 U.S. at 252. The *Rayner* court noted that the FRSA (at that time and at times relevant to Abbott's appeal) had an express preemption provision in which Congress had declared that "laws, rules, regulations, orders, and standards relating to railroad safety shall be nationally uniform to the extent practicable." *Rayner*, 873 F.2d at 65 (quoting 45 U.S.C. § 434 (1988)). Legislative history also revealed that Congress had concluded that railroad safety could be best achieved by uniform standards. *Id.* The court accordingly concluded

that state-law claims were preempted by the administrative remedy afforded under the FRSA. We agree.

We see no error in the analysis of *Rayner* and no error in the district court's application of it here. As we have already noted, Congress later decided not to preempt state law claims like Abbott's claim for wrongful discharge, so our holding will likely have little effect in future cases. We conclude that the district court did not err in dismissing the retaliation claim as preempted by federal law.

**B**

Plaintiff Abbott has also appealed from the district court's grant of Defendant BNSF's motion for summary judgment on his claim of breach of contract. The district court held that Abbott's employment was at-will, leaving the employer free to terminate the relationship at any time, for any reason or for no reason. Accordingly, the district court held that Abbott could not prevail on the claim that his termination constituted a breach of contract.

"We review a grant of summary judgment *de novo*, applying the same standard as the district court." *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998). Under Fed. R. Civ. P. 56(c)(2), summary judgment should be entered by the district court "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." On appeal,

> [w]e examine the record to determine whether any genuine issue of material fact was in dispute; if not, we determine whether the substantive law was

applied correctly, and in so doing we examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing the motion.

*McKnight*, 149 F.3d at 1128 (brackets and quotations omitted).

Abbott did not have a written commitment from BNSF to employ him for any length of time. Consequently, Abbott relies on an alleged implied contract.

"Under the American common law an employer may discharge his 'at-will employee' for good cause, for no cause, or even for a wrong cause, without incurring liability to the employee for wrongful discharge." *Morriss v. Coleman Co.*, 738 P.2d 841, 846 (Kan. 1987).[4] Kansas courts "[h]istorically" followed this doctrine. *Id.* at 847. Thus, in the "absence of a contract, express or implied, . . . the employment is terminable at the will of either party . . . ." *Johnson v. National Beef Packing Co.*, 551 P.2d 779, 781 (Kan. 1976). Kansas does recognize that parties may bind themselves to a contract – the implied-in-fact contract – without contractual formalities, and such contracts can be formed in the employment relationship:

> The implied contract theory recognizes an implied obligation on the employer to not terminate an employee arbitrarily where a policy or program of the employer, either express or implied, restricts the employer's right of termination at will. In essence, the employer is barred from

---

[4]The statement quoted is a description of the traditional common law and not of Kansas law at the time. As the court went on to mention, there has been "erosion of the doctrine." *Morriss*, 738 P.2d at 847. Thus, Kansas law now recognizes that some "wrong reasons" for discharge violate Kansas public policy and will give rise to an action for wrongful discharge. Abbott was relying on just such an exception in his claim that his discharge violated Kansas policy that protects whistle blowers, as discussed *supra*. And under Title VII, federal law prohibits discharges based on race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a).

violating its own policies in discharging the employee.

*Inscho v. Exide Corp.*, 33 P.3d 249, 253-54 (Kan. App. 2001).

The implied contract theory on which Mr. Abbott relies here rests on mutual intent. *Morriss*, 738 P.2d at 848. "The existence of an implied contract depends on the intent of the parties, divined from the totality of the circumstances." *Anglemyer v. Hamilton County Hospital*, 58 F.3d 533, 537 (10th Cir. 1995).[5] Intent

> is to be ascertained from several factors which include written or oral negotiations, the conduct of the parties from the commencement of the employment relationship, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment, and any other circumstances surrounding the employment relationship which would tend to explain or make clear the intention of the parties at the time said employment commenced.

*Morriss v. Coleman Co.*, 738 P.2d 841, 848-49 (Kan. 1987).

Whether the parties have created an implied contract is usually a question of fact, but summary judgment is proper if the employee's evidence shows only "his own unilateral expectations of continued employment." *Warren v. City of Junction City*, 176 F.Supp.2d 1118, 1126 (D. Kan. 2001). The employee must instead show evidence of mutual intent to enter into an agreement which prohibited termination except for cause.

We therefore must examine the evidence adduced by Abbott to support his claim that BNSF had made an implicit promise not to terminate his employment arbitrarily.

---

[5]Throughout this discussion, references to implied contracts are to contracts implied in fact, as opposed to the quite distinct doctrine of quasi-contracts, also known as contracts implied in law. *See, e.g., Allegri v. Providence-St. Margaret Hlth. Ctr.*, 684 P.2d 1031, 1035 (Kan. Ct. App. 1984).

When asked about this in his deposition, Abbott said that the railroad's code of conduct for salaried employees was part of his contract, along with his annual evaluations, his expectations, his supervisor's comments, his goals and directions, his promotions, and his paycheck. II Aplt. App. 228. In his briefs on appeal, Abbott cites this testimony but emphasizes BNSF's practice of treating employees fairly and firing only for cause. Abbott also relies on BNSF's exempt discipline policy.

The exempt discipline policy provides that a salaried employee who

is not meeting overall expectations for the position, or demonstrates a specific skills deficiency or a specific attitude or non-constructive behavior, may be placed on a performance improvement plan. The company however, reserves the right to discipline or terminate an employee without a performance improvement plan, if approved by the Vice President of Human Resources/Medical.

III Aplt. App. 519. The exempt discipline policy concludes with this disclaimer: "This policy, as well as all the policies herein, is not intended to imply a contract of employment. Employment can be terminated, with or without cause, and with or without notice, at any time, at the option of either the Company or the employee." *Id*. at 520.

The code of conduct similarly concludes with a disclaimer of any intent to enter into a contract with the employees for other than at-will employment: "This Code of Conduct is not a contract for services and does not alter the employment at will relationship between BNSF and its employees." *Id*. 501.

Disclaimers such as these are not, in spite of their absolute terms, always determinative of the question whether the employer intended to bind itself to an implied contract under which the employee could only be fired for cause; they are not dispositive

-11-

if there is evidence of contrary intent. *See Morriss*, 738 P.2d at 849; *Brown v. United Methodist Homes*, 815 P.2d 72, 82-83 (Kan. 1991). But they are strong evidence that the employer did not have such an intent, and especially where the evidence shows that the employee has read the disclaimer. *See Kastner v. Blue Cross and Blue Shield of Kan., Inc.*, 894 P.2d 909, 919 (Kan. App. 1995) (where plaintiff admitted reading a disclaimer stating that the policies of the employee manual were not intended to create an implied contract, the disclaimer was dispositive of the question of whether the employer intended to form a contract with plaintiff); *Henderson v. Montgomery County*, 213 F.Supp.2d 1262, 1278 (D. Kan. 2002) (fact that plaintiff read the contents of employee handbook, including the disclaimer language, "severely undercut" plaintiff's implied employment contract).

Here, Abbott testified that he had read the code of conduct, having signed a statement that he had read it, and that he was familiar with the exempt discipline policy. III Aplt. App. 574. He said that he did not specifically recall the disclaimers and that he did not know what "employment at will" meant. In view of the fact that Abbott was required to and did read and sign the disclaimer in the code of conduct, a reasonable juror could only find that he was aware of at least one of the disclaimers. Moreover, the disclaimer in the exempt discipline policy does not use the term "employment-at-will" but explains it in everyday language (as quoted *supra*), These two documents with their disclaimers thus support the position of BNSF that the employment was at will, rather than Abbott's position that an implied contract existed with other terms of employment.

We turn our focus next to the provisions of these documents that Abbott cites to support his contention that his employment was something other than at will. In other words, we must see if there is evidence of intent contrary to the disclaimers, evidence which would make the disclaimers less than dispositive. Abbott emphasizes that the code of conduct states that BNSF does business in an ethical manner and treats its employees "honestly, loyally, in a trustworthy and fair manner . . . ." III Aplt. App. 476. He also cites testimony from several high ranking employees of BNSF who all said that the company tries to be fair with its employees.

On its face, the contention that an employer's statements to the effect of having a policy of treating employees fairly is evidence that the employer intended to commit itself to some employment term other than employment-at-will lacks logical force. We think it common sense that an employer can treat at-will employees fairly. Abbott, however, points to language from some cases that cite a commitment to a policy of fairness as evidence of an implied contract of employment other than at-will. But close examination of these cases shows that statements of intent to be fair standing alone are not sufficient to create an issue of fact. As we review the cases, we are mindful that Abbott also relies on testimony that the railroad only terminated employees for cause. These two factors, representations of fairness and of terminating only for cause, are not discrete but are often discussed together in the cases.

Abbott relies on *Brown v. United Methodist Homes*, 815 P.2d 72 (Kan. 1991), and particularly a statement from that case regarding the evidence necessary to show an

-13-

employer's "contrary intent," that is, intent to form a relationship other than at-will. The *Brown* court found evidence sufficient to create a jury question notwithstanding the employer's use of a disclaimer, Abbott contends, because there was testimony from supervisory employees "indicating their intent to treat employees fairly and to follow the rules." 815 P.2d at 83. But there was also other evidence in *Brown*. In particular, the employer in that case had added to the personnel manual language specifically disclaiming any intent to enter into a contract with its employees, but that disclaimer had been added *after* the plaintiff had begun working. This "presented questions" about whether the disclaimer applied to Brown at all. *Id.* Moreover, the disclaimer in that case was contradicted by a "stated policy . . . to treat all employees fairly in accordance with Christian principles and not to discharge an employee 'except for cause.'" *Id.* at 82.

In this case, by contrast, the disclaimer was extant and brought to Abbott's attention, and there is no "stated policy" to discharge only for cause. Abbott nevertheless contends that it was the policy of the railroad to fire only for cause, citing testimony of some supervisory employees. This evidence is insufficient, however, to indicate that the railroad had intentionally agreed with the employees that discharge would *only* be for cause, a point we discuss further *infra*.

Abbott also relies on *Wilkinson v. Shoney's, Inc.*, 4 P.3d 1149 (Kan. 2000). In that case, a disclaimer much like the ones on which BNSF relies here was found insufficient to mandate summary judgment for the employer on the former employee's breach of implied contract claim. The evidence in that case was, however, considerably stronger

-14-

than the evidence produced by Abbott in the present case.

In *Wilkinson*, the plaintiff "presented evidence of Shoney's written policies of fair treatment, progressive discipline, firing for cause, and of not holding past employment problems against a rehired employee once the employee passed the Rehire Board." 4 P.3d at 1163. The employer's policies with respect to sexual harassment "contained step discipline . . . with the fourth offense resulting in termination." *Id.* Moreover, there was evidence that "new employees were customarily introduced to these policies upon being hired and were encouraged to read and re-read them in order to familiarize themselves with the policies." *Id.* Wilkinson himself had been in a managerial position and testified that he had been "trained as a manager to make sure there is reason to terminate someone." *Id.* Thus, that case featured considerable evidence that could support a finding that the employer's intention was to enter into a relationship with the plaintiff that was not employment-at-will.

Abbott contends that it was universally believed at BNSF that employees were only fired for cause. He cites deposition testimony of several supervisors and officers to support his contention that everyone at BNSF – from all ranks – believed this to be the case. In reply to the railroad's point that some of the same supervisory employees testified that the railroad could terminate for any reason or for no reason, even though it typically did not happen, Abbott argues that this only shows that the issue is one that should have been reserved for the jury.

Abbott has produced no evidence, however, that his belief that he could only be

-15-

fired for cause was formed at the time he assumed his position at the technical training center. More importantly, however, this evidence simply does not have the dispositive effect that Abbott claims for it. In *Inscho*, the employer's human resources manager had testified that he did not terminate employees arbitrarily, nor was he aware of any employee who had been terminated for any reason other than violation of a company policy. 33 P.3d at 251. In addition, the plaintiff in that case introduced evidence that the employees "overwhelmingly believe they have job security as long as they perform their job in a satisfactory manner." *Id*. at 252. The appellate court nevertheless affirmed the trial court's grant of summary judgment in favor of the employer, holding that Ms. Inscho had demonstrated "only a unilateral expectation of continued employment." *Id*. at 253. As for the manager's testimony, the court said that this evidence that the employee "had previously terminated employees only for violations of policy does not demonstrate an intent by [the employer] that a violation was required prior to termination." *Id.*

As some courts have observed, to draw an inference that an employer had committed itself to fire only on good cause in the future from evidence that it had followed that practice in the past would create a perverse incentive for employers "to occasionally fire employees for no other reason than to show that they maintain the freedom to do so." *Taylor v. Home Depot USA, Inc.*, 506 F.Supp.2d 504, 519 (D. Kan. 2007) (quoting *Burke v. BDM Technologies, Inc.*, 172 F.3d 62 (table), 1999 WL 40973, *

3 (10th Cir. 1999)).[6] We add that the same applies to Abbott's claim that an expressed policy of treating employees fairly should defeat summary judgment on an implied contract claim. Courts should avoid creating an incentive for employers to treat employees unfairly simply to establish that they have only entered into employment-at-will relationships. Moreover, as to the fair treatment assertion, we think it simply illogical because we see no inherent contradiction in treating employees fairly while maintaining the right to terminate at will. When the relationship is entered into as one at-will, there is not necessarily unfairness in treating it that way.

It may not be possible to reconcile all of the cases in this area. In general, however, we find that Abbott has relied on broad statements from cases that, on examination, include significant facts that make those cases distinguishable from his. For example, Abbott cites a statement from our court that "a general belief that the [employer] only terminated its employees for cause" would "[t]ypically . . . be sufficient to present a jury question of whether an implied contract of employment existed." *Anglemyer v. Hamilton County Hospital*, 58 F.3d 533, 538 (10th Cir. 1995). Abbott, however, glosses over the pertinent facts of that case. There the employee presented evidence that representations had been made to her and others by two administrators that employees would only be fired for cause, despite the disclaimers in a new employee handbook. And the employee in that case had repeated those representations in a meeting

---

[6]*Burke* was, in turn, quoting from *Hartbarger v. Frank Paxton Co.*, 857 P.2d 776, 785 (N.M. 1993).

-17-

of the board of directors, none of whom contradicted the representation. 58 F.3d at 536.

It was in this context that our court said that "this evidence" would typically be sufficient to withstand a motion for summary judgment. Moreover, these statements were dicta, because the plaintiff had not been terminated and our court decided the appeal on other grounds. 58 F.3d at 538-40 (holding plaintiff, who had not been terminated but only reassigned, did not have a property interest in her previous position to support a claim under section 1983).

Other arguments Abbott advances on appeal have no merit. Abbott contends that the district court improperly made findings on certain points on disputed evidence, where in considering the railroad's motion for summary judgment the court should have noted these disputes as questions for the jury and denied summary judgment. We conclude that these points are not material to our analysis so that it is not necessary for us to resolve them. First, Abbott complains that the district judge found that he had been warned in October 2006 that he could be fired if his performance did not improve, even though Abbott denied that he had been told this, thinking instead that, at worst, he might be demoted one grade. But our conclusion that Abbott has not shown that the railroad had bound itself to an implied contract of employment with him is not dependent on this point.

Similarly, Abbott cites as error the district court's statement that Abbott's supervisor, Hobbs, had reluctantly agreed with the recommendations of Hobbs' superiors that Abbott be terminated. Again, this dispute is not material to the issue of the existence

of an implied contract of employment.

Abbott also complains that the district court found merely that the railroad "generally" terminated employees only for cause and in citing testimony of "some" supervisors that employment was at-will. Abbott contends that it should have been for the jury to decide whether the railroad terminated only for cause. Because we find that the railroad had clearly reserved the right to terminate employment for any reason, this dispute, if it rises to that level, is also immaterial.

Finally, Abbott asserts that the district court made a "critical" finding that the exempt disciplinary policy was discretionary and that this was also a question that should have been reserved for a jury. But the exempt discipline policy is discretionary on its face, as we have already noted. That policy states, *inter alia*, that the railroad "reserves the right to discipline or terminate an employee without a performance improvement plan, if approved by the Vice President of Human Resources/Medical." III Aplt. App. 519.

This last point overlaps with another contention by Abbott. He points to considerable conflicting evidence in the record as to whether his discipline was approved by the designated officer. We think this controversy is quite beside the point. For purposes of determining whether an implied contract existed, the key part of the sentence quoted from the exempt discipline policy is that the railroad reserves the right to terminate an employee without a progressive discipline plan. Because Abbott has not adduced evidence to contradict this disclaimer, we hold that there was no implied contract. The alleged failure to have the decision approved by the officer designated in

-19-

the policy could only go to whether there was a breach of contract, after the existence of a contract had been established. The company reserved the right to terminate Abbott's employment for any reason or no reason. He therefore could not have had a vested right in having that decision made only by one specific officer in the company rather than another.

## III

For the reasons stated herein, the judgment of the district court is AFFIRMED.

Entered for the Court

William J. Holloway, Jr.
Circuit Judge