Mary L. ENSTROM, Plaintiff,

v.

BEECH AIRCRAFT CORPORATION, Defendant.

Civ. A. No. 85–6078–T.

United States District Court, D. Kansas.

March 28, 1989.

Jim Lawing, Wichita, Kan., for plaintiff.

Larry B. Spikes, Terry L. Mann, Martin, Pringle, Oliver, Wallace & Swartz, Wichita, Kan., for defendant.

## OPINION AND ORDER

THEIS, District Judge.

This matter comes before the court for final disposition after a three day bench trial. Plaintiff claims her termination of employment from defendant Beech Aircraft Corporation ("Beech") was in retaliation for failing to give testimony favorable to Beech in an EEOC investigation in violation of 42 U.S.C. § 2000e–3(a), Title VII of the Civil Rights Act of 1964, § 704(a), and an implied employment contract under *Morriss v. Coleman Co.*, 241 Kan. 501, 738 P.2d 841 (1987). After reviewing the evidence heard at trial, including both the law clerk's and the court's comprehensive, contemporaneous notes, and the parties' post-trial memoranda, the court is prepared to rule. Pursuant to Rules 52 and 58 of the Federal Rules of Civil Procedure, the court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Plaintiff began work at Beech on April 23, 1974 as a typist in an hourly paid position. In January 1977 she transferred to a typist position in the Aviation Education Department (Av. Ed. Dept.). Almost three years later in November 1979, she advanced to the salaried position of Aviation Education Specialist. The Av. Ed. Dept. consisted of three persons: the head of the department, Marion Stevens, plaintiff and a secretary. The department produced promotional and educational activities for Beech. Until February 1983, plaintiff always received high performance reviews and salary increases. For example in November 1982, she received a significant salary increase, 9.8%, at the financially troubled company. Def.Ex. No. 146.

2. The overall evidence showed that plaintiff was a highly moralistic and religiously motivated woman who was offended by what she regarded as sexually colored language or conduct. The evidence also showed she could be verbally outspoken at times when better judgment would have cautioned silence or a lessened response. No evidence demonstrated that her attitude reflected on her reputation as a dedicated and efficient worker. Her employment record disclosed no allegations of misconduct until early 1983.

3. Beech employees were made aware of company discipline policies via the "Company Rules and Conduct" booklet (handbook). Plaintiff received a copy of the handbook when she began work. The handbook contains 50 rules of conduct and provides the employee with notice of the likely punishment for the first, second or third violation of each rule. The punishment ranges from termination for consuming alcohol or illegal drugs on Beech property to a written reprimand for failing "to exhibit badge in plain sight above the waist." *Id.* at Rules 5, 6 & 27. The last rule is followed by the following qualifying paragraph:

> The disciplinary actions outlined in the sections above are those which would normally be applied in routine actions. It may be necessary to assess either more severe or less severe penalties depending on the seriousness of the rule infraction. The discipline applied will be determined by the Management representatives involved, after bringing to bear their best judgement considering the equitable and consistent application of the policy involved.

*Id.* at p. 12.

4. Beech management employees testified that Beech's goal was to have a "fair"

discipline policy and practice. Testimony of Bill Robinson, Vice Pres. for Corporate Communications with oversight of the Av. Ed. Dept.; Testimony of James Shelden, Dir. of Personnel Placement. As Robinson testified on cross examination, the fairness policy and the rule book led management to generally use progressive discipline techniques: investigate actions prior to taking disciplinary actions and hand out harsher punishment for repeat or gross offenses.

5. By early 1983, Beech needed to reduce its work force due to a general down turn in the general aviation industry and declining sales. Beech management decided to reduce the the Av. Ed. Dept. from three persons, Stevens, plaintiff and a secretary, to one person—Stevens. Plaintiff had "bump back" rights to several secretarial positions and to the tour guide program. She met with Robinson to discuss these various positions on February 7, 1983. Management did not favor her taking a secretarial position; Robinson suggested plaintiff join the tour guide program. Plaintiff, with reticence and after receiving approval to speak "frankly" about this option, stated that the supervisor and the two guides were known around the plant as "the madam and her two whores." Robinson had the highest opinion of the tour guide supervisor, had never heard of this appellation for her and became extremely angry over the remark. He ended the meeting and a few minutes later called Shelden to recommend her termination. Plaintiff's conduct arguably violated Rule 47 of the handbook: "The making or publishing of false, vicious or malicious statements concerning any supervision." Def.Ex. No. 142. The prescribed punishment by the handbook is termination. *Id.*

6. Beech did not terminate plaintiff; it began an investigation of her conduct. At Shelden's direction, Nita Long, the equal employment opportunity coordinator, interviewed six people familiar with plaintiff's work. Long reported in a memo to Robinson and Shelden that most felt plaintiff would not work well with the tour guides because of prior unfriendly relations. While many of those interviewed also did not like how plaintiff had dealt with them, they recognized plaintiff performed well with the Aviation Ed. Dept. Def.Ex. No. 103. Beech suspended plaintiff for violating Rule 47. Def.Ex. No. 147.

7. On February 9, Robinson, Shelden and Long met with plaintiff to inform her of her suspension without pay pending further investigation. They discussed the "tour guides" comment and other comments plaintiff reportedly made. Plaintiff denied one charge and attempted to disprove it with allegations about Robinson's sexual activity. Robinson became very angry and left the meeting. Robinson exhibited significant hostility to plaintiff in his testimony. The court finds much of his testimony lacking significant credibility.

8. Plaintiff remained and disclosed many past actions by her supervisor, Stevens, that violated Beech policy. She alleged numerous acts that could constitute sexual harassment: Stevens would secure adjoining hotel rooms when they travelled; he would insinuate or not eliminate the impression they were married; he would force her to accompany him during non-working hours when travelling; Stevens would ask embarrassing questions during her presentations; when both presented speeches to a group, he would steal topics from her presentation and incorporate them in his speech, leaving her with little to say. At the end of the meeting, Shelden asked plaintiff to make a formal statement to Long about Stevens. Plaintiff refused to make a statement and would not accuse Stevens of "sexual harassment." Testimony of plaintiff and Shelden.

9. Nonetheless, Beech began an investigation of Stevens. The investigation resulted in verification of plaintiff's complaints and revealed numerous other areas of impropriety by Stevens. Robinson and Shelden met with Stevens on February 14 to inform him Beech would suspend him with pay pending further investigation. The charges were: 1) sexual harassment of plaintiff; 2) poor job performance with aviation professional organizations; 3) misuse of travel funds and company equipment; and 4) taking action exceeding his authori-

ty. Beech communicated these charges to him orally and via a memo by Robinson summarizing the meeting. Def.Ex. No. 106. Robinson emphasized to Stevens that his termination was not certain and Beech would try to work with him:

You requested we contact several individuals and solicit from them information concerning your performance. We have agreed to do this and before we determine the final outcome, we will discuss with you the possible courses of action on the part of the Company; or, should termination be in order, the various options open to you.

*Id.* at 2.

10. Plaintiff returned to work because Beech confirmed her allegations of Stevens' misconduct. First on February 11, Shelden changed her suspension from without pay to with pay. On February 16, Robinson reinstated plaintiff and made her the sole member of the Av. Ed. Dept. under the supervision of Jim Osment, General Manager for Advertising and Sales Promotion. Shelden and Robinson imposed several conditions of reinstatement: 1) plaintiff had to improve relations with the Public Relations staff; 2) she would meet with Osment and Shelden every 30 days for six months to assess her performance; and 3) she must eliminate conducting personal business at work and follow Beech travel expense repayment policy. Def.Ex. No. 107 at 1. Robinson closed the memo with a statement about her probationary status at Beech:

We believe you can be successful in this assignment since reports from the field and from Beechcrafters have indicated that you are competent, hard working, and capable of performing the activities associated with Aviation Education. While you have alienated a number of people, we believe that a concerted attempt to resolve these problems is worth the effort. If you are able to overcome the internal problems, you will remain employed. If these matters cannot be resolved, then you will be terminated.

*Id.* at 2.

11. In mid-March in preparation for a termination meeting with Stevens, Shelden contacted plaintiff about reducing her oral charges against Stevens on February 9 to a written statement. Shelden testified he talked to plaintiff about her charges and Stevens' termination. He stated he "wanted a written statement to close the file" on Stevens but did not think it was really "necessary" because of the information already gathered. Shelden specifically denied plaintiff's quid pro quo allegations that her job would be in jeopardy if she did not sign a statement. Def.Ex. No. 136 (March 16, 1983 entry in plaintiff's chronology of events surrounding her termination submitted to the EEOC); Pl.Ex. No. 105 (March 16, 1983 entry in plaintiff's 1983 daily calendar). After consulting with her lawyer, plaintiff reiterated to Shelden her desire not to make a statement against Stevens on March 18. Plaintiff noted in her diary that Shelden was "irritated" by her repeated failure to make a statement. Pl.Ex. No. 105 (March 18, 1983 entry).

12. The court finds that plaintiff's version of the mid-March events is more credible. The court is somewhat skeptical about the exact wording of the quotations plaintiff attributes to Shelden in her EEOC chronology, Def.Ex. No. 136. However, the court is firmly convinced plaintiff was keenly aware of the ramifications of her failure to make the requested statement because 1) Shelden admitted he asked her for a statement accusing someone of sexual harassment; 2) Shelden admitted he wanted to complete his file with her statement before the termination meeting with Stevens, 3) plaintiff twice refused to make the requested statement, and 4) plaintiff gave the same testimony about the March discussion to an EEOC investigator in December 1983 before she was terminated. The court found plaintiff a very credible witness. Management need not draw pictures in black and white or say a talismanic phrase for an employee to get the desired message.

13. Five days after Shelden talked with plaintiff, Shelden and Robinson had another meeting with Stevens to discuss his termination. The first two points at the meet-

ing involved the sexual harassment claim. Def.Ex. No. 110 at 1 (Shelden's notes of meeting). They informed Stevens of the substantial evidence about his violation of ¶ 3 of Beech's sexual harassment policy, interference with work performance and creation of a hostile work environment. Def.Ex. Nos. 143 (policy), 110 at 1, 2. Shelden and Robinson then dealt with Stevens' violation of company policy on travel and making company decisions without the requisite authority. Def.Ex. No. 110 at 2. Shelden told Stevens he would be terminated or allowed to retire early. After Stevens responded, the termination was apparently held in abeyance until Shelden could call people Stevens suggested would refute some of the charges. *Id.* at 2–3. The trio then discussed how Stevens could use accrued sick leave and vacation pay to remain employed to age 62 and receive better pension benefits.

14. On June 28, Stevens filed an age discrimination complaint with the EEOC. Def.Ex. No. 155. The EEOC informed Beech of the filing in a letter received by Beech on July 11. *Id.* Stevens informed Beech that he would not accept early retirement on July 18. Def.Ex. No. 115. Shelden terminated Stevens for cause two days later based on the March 21 stipulation that he would either retire or be terminated. *Id.*

15. Plaintiff worked the six months after her reinstatement without incident. Plaintiff performed many of the same duties in her new position as she did prior to the elimination of the Av. Ed. Dept. No witness testified about any problem with her attitude or activities. Contrary to the reinstatement agreement, Osment and Shelden did not convene monthly meetings to review her performance. Beech's failure to hold monthly evaluations is consistent with the testimony of Shelden and Robinson that plaintiff's good conduct satisfied the conditional reinstatement agreement of February 16, 1983.

16. On August 1, Osment informed plaintiff that Beech would eliminate the Aviation Ed. Dept. at the end of the week because of a continued decline in Beech sales. Plaintiff could again use her bump back rights to prevent her termination. After discussing possible positions with Shelden, he informed plaintiff on August 3 that he had secured a spot for her. Plaintiff testified and her diary and EEOC chronology support her claim that Shelden reiterated Beech's need for favorable testimony from her on Stevens' termination. Def.Ex. No. 136; Pl.Ex. No. 105. Beech asserts plaintiff's version of the August 3 conversation is incredible because it includes a phrase from Shelden that a man from EEOC would question her. Dkt. No. 34 at 2–3. Beech documents that it did not know a man from EEOC would come to Wichita to interview Beech employees until November. Def.Ex. No. 151. The court does not find it incongruous that Shelden, a personnel manager familiar with EEOC complaints and investigations, Def.Ex. No. 136 at August 3 entry, would know and tell plaintiff that someone from the EEOC would ask about Stevens' termination. The court is also not troubled by plaintiff's more emphatic trial testimony about the August 3 conversation than in her journal or EEOC complaint. Dkt. No. 34 at 1–2. The trial testimony merely makes explicit what is implicit in plaintiff's documents. The court finds plaintiff's testimony credible.

17. Plaintiff bumped back in mid-August to a new department as a secretary under Bill Condiff and Gordon Pendergraft. She performed considerably less aviation education work. Over the next few months, Condiff's department provided plaintiff with insufficient secretarial work to keep her occupied. Plaintiff expressed her displeasure to her supervisors over her diminished responsibilities and lack of work.

18. In light of plaintiff's inactivity, Condiff volunteered her to work on a major reception Beech would host on November 15. Plaintiff would work under Marsha Hutchinson, a woman who was plaintiff's secretary when plaintiff was in the Av. Ed. Dept. Plaintiff's task was to handle RSVPs from the 1,000 plus invitees. Plaintiff staffed the telephone number printed on the invitation. If plaintiff's number was

busy, the next call was automatically forwarded to another phone near by. The phone operator was instructed to take down the name of the invitee and the number of persons attending the reception. If the invitee had any questions, the phone operator was to transfer the call to Marsha Hutchinson. Plaintiff's work station was in an open area near other secretaries desks and could be observed by her supervisors, Condiff and Pendergraft. Hutchinson worked in another building.

19. Beech terminated plaintiff because she allegedly was rude in the way she answered RSVP calls. Def.Ex. No. 122 (Les Jordan termination memo to file, December 20, 1983). Marsha Hutchinson provided much of the evidence for this charge in her trial testimony and in a December 12, 1983 memo. Def.Ex. No. 120. Hutchinson's testimony and memo recount four instances when invitees transferred to her informed her that the woman who answered the phone treated them rudely or abruptly. *Id.* at 2–3. Hutchinson related only one instance in her memo and none in her testimony when she positively identified plaintiff as the person who answered the call and transferred it to her. *Id.* at 2. Hutchinson testified she told Condiff and Pendergraft about plaintiff's rudeness during the RSVP week and they both reported they were aware of plaintiff's conduct. Hutchinson's December 12 memo does not mention any discussion with Pendergraft. *Id.*

20. Beech also relies on the observations of Condiff and Pendergraft to substantiate the rudeness charge. Long's compilation of Pendergraft's observations concludes:

> He said he witnessed her impatience with persons calling in on the Starship reception. He said he is very uncomfortable working in that situation and further feels she could be terminated for her poor attitude. Aside from her poor attitude, Gordon felt her job performance was satisfactory—she was very efficient.

Def.Ex. No. 152 (December 12 Memo). Condiff also noted plaintiff's poor attitude and the following:

> He personally witnessed Mary's rudeness on the phone with persons calling in to RSVP and had intended to talk to her about her behavior. However, Gordon was not in and by the time he returned, the problem had seemed to lessen. When asked, he felt he could not terminate Mary on her attitude alone.

*Id.* Hutchinson's secretary, Gayle Bigler, who dealt with plaintiff often during the RSVP period, also stated plaintiff disliked her job and had "a bad attitude." After a few days, though, plaintiff's animosity towards Bigler evaporated and "she was very friendly." Def.Ex. No. 121 (Bigler to Hanssen Memo, December 12, 1983).

21. Plaintiff testified she was not rude to reception invitees. She also offered the deposition testimony of Jim Osment to rebut the rudeness charge. Osment described what he heard and saw of plaintiff's conduct on the telephone:

Q. Did you ever hear Ms. Enstrom talk to anybody on the other end of the line in a manner that you thought was rude or improper fashion?

A. Well, I—yes. I don't—I think that's probably a good term where she said—you know, they had asked her a question and she said, well, I can't answer that, you know, all I'm here to do is—is get the numbers. And I asked—I asked her what the occasion was, and she said well, they were wanting to know if they could bring, well, you know, three or four other people, and I just have these two names, you know, I don't have any authority to say, yes, they can bring these people or they can't, that's somebody else's job. I—I wouldn't say it's rude, but, you know it was pretty curt. She did what she could and then that was it.

Plaintiff's rebuttal exhibit at 14 (Osment Depo.).

22. No Beech employee at any time *prior* to her termination discussed plaintiff's allegedly rude telephone conduct. Long reports Condiff said he "intended" to talk to her about RSVPs but did not. Def.Ex. No. 152. Hutchinson's response after receiving complaints from callers about the telephone operator she thought must have

been plaintiff was to decide "to make complaints to Mary's supervision [sic]. On that particular day, however, Bill Condiff, Les Jordan and Bill Robinson were all out of town. By Monday, November 14, I decided not to make a formal complaint since the reception was the next day." Def.Ex. No. 120 at 2. On Monday after another caller complained about the telephone operator, Hutchinson reported: "I spoke personally with Bill Condiff and indicated to him my displeasure with the *cooperation* of Mary Enstrom on this important project." *Id.* (emphasis added).

23. Two days after the reception, Hutchinson called plaintiff and thanked her for her assistance on the reception. Plaintiff testimony; Pl.Ex. No. 105 (journal entry of November 17); Def.Ex. No. 136 (EEOC chronology of November 17). Hutchinson expressly denied thanking her for her job on the reception. The court finds plaintiff more credible than Hutchinson because of their respective courtroom demeanors, plaintiff's more contemporaneous written accounts of the event and the role reversal for Hutchinson from secretary for plaintiff to manager over plaintiff.

24. On December 2, Michael Katz of the EEOC interviewed plaintiff, Robinson and Shelden about Stevens' termination. Long's notes of the meeting with plaintiff reveal the first topic was her fear of retaliation for not making a complaint or statement against Stevens. Def.Ex. No. 117 at 1. Plaintiff also apparently stated she made the accusations against Stevens because she was under duress. *Id.* She further undercut Beech's case for termination by stating that Beech fired Stevens because "he was his own man." *Id.* at 2. Long's few notes on the interview with Shelden and Robinson have no relevant information. Def.Ex. No. 118.

25. Robinson and Shelden denied at trial any knowledge about plaintiff's EEOC testimony prior to her termination. Long also denied at trial telling anyone about plaintiff's testimony prior to her termination.

26. On either December 1 or 2, Hutchinson initially mentioned plaintiff's alleged rudeness to invitees to Robinson. Al-

though the parties dispute the date of this conversation, the court can glean no importance in resolving this dispute. Hutchinson and her secretary Bigler were directed to document their dealings with plaintiff during the weeks before the reception. Both prepared memos dated December 12. Long's compilation of her interviews with Condiff and Pendergraft also bears the same date.

27. On December 20, Beech terminated plaintiff because of unsatisfactory job performance—her rude behavior in handling the reception calls and in passing plaintiff's suspension in February. Def.Exs. No. 122 (Les Jordan Memo to File) and No. 123 (Jordan to Hanssen Memo on termination meeting). At her termination meeting, plaintiff denied the charge of rudeness and complained that no one told her about the perceived problems with her telephone conduct or attitude. *Id.*

28. Plaintiff filed a complaint of retaliatory discharge with the EEOC two days later. "I firmly believe my termination is not the result of my attitude but the result of my testimony December 2, 1983 to Michael Katz of your office. I believe this is a retalitory [sic] action." Pl.Ex. No. 15.

29. Beech, Stevens and EEOC began settlement negotiations three days after Katz interviewed the three Beech employees. Nita Long Testimony. Beech and Stevens reached a settlement in January or early February. Stevens received several additional months of back pay and back retirement pay in return for dismissing the EEOC claim. Pl.Ex. No. 24.

30. Plaintiff's ten year employment date with Beech was April 23, 1984, four months after she was terminated. After ten years of employment, plaintiff's pension benefits vest. If her pension would have vested, she could have received $72.49 per month at age 55 or $161.89 per month after age 65.

31. Plaintiff's base annual rate of pay when Beech terminated her was $19,718, the salary she received as a secretary from August to December 1983. Her higher salary in the first eight months as aviation education specialist is not material because

Beech abolished the position and plaintiff presented no evidence that Beech would restore the position or her to it. In 1984, plaintiff received $5,542 in unemployment benefits and $2,769 in wages. Plaintiff regained full-time employment in 1985 and thereafter at a salary comparable to her pay at Beech.

32. Plaintiff wanted to stay employed at Beech ten years until her pension vested. Testimony by plaintiff; Def.Ex. Nos. 136 at December 14 entry and 152.

## CONCLUSIONS OF LAW

1. The court has subject matter jurisdiction over this action. 28 U.S.C. § 1331; 42 U.S.C. § 2000e–3(a). Personal jurisdiction and venue are proper in this district. This matter is properly before this court.

## A. TITLE VII CLAIM

2. The court will first address plaintiff's claim for retaliatory discharge. The court begins with the statutory language: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has ... participated in any manner in an investigation ... under this title." 42 U.S.C. § 20003–3(a).

3. The Tenth Circuit recently summarized the burden of proof in a retaliation case:

Our circuit applies the general approach for dealing with circumstantial proof in disparate treatment cases adopted by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, [93 S.Ct. 1817, 36 L.Ed.2d 668] (1973), to retaliation claims under Title VII. *Burrus v. United Telephone Co. of Kansas, Inc.*, 683 F.2d 339 (10th Cir. 1982).... In order to establish a prima facie case of retaliation, the plaintiff must show: (1) protected opposition to discrimination or participation in a proceeding arising out of discrimination; (2) adverse action by the employer contemporaneously or subsequent to the employee's protected activity; and (3) a causal connection between such activity

and the employer's action. *Burrus*, 683 F.2d at 343.

*Anderson v. Phillips Petroleum Co.*, 861 F.2d 631, 634 (10th Cir.1988). The *Burrus* court stated that "(t)he causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." 683 F.2d at 343 (citations omitted).

4. The *Anderson* court also outlined the remaining order of proof:

Once the plaintiff has established a prima facie case, the burden of production shifts to the defendant who must articulate a legitimate, nondiscriminatory reason for the adverse action. *Id.* [*Burrus*, 683 F.2d at 343]. Once the defendant has dispelled the inference of retaliation by establishing a legitimate reason, 'the plaintiff may still prevail if she demonstrates the articulated reason was a mere pretext for discrimination.' *Id.*

*Anderson*, 861 F.2d at 634.

5. The type of evidence that proves pretext is broad. "The plaintiff may prove his case by direct or circumstantial evidence. The trier of fact should consider all the evidence, giving it whatever weight and credence it deserves." *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 714 n. 3, 103 S.Ct. 1478, 1481 n. 3, 75 L.Ed.2d 403 (1983). "In some cases a 'plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation.' *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 255 n. 10 [101 S.Ct. 1089, 1095 n. 10, 67 L.Ed.2d 207] (1981)." *Love v. Re/Max of America, Inc.*, 738 F.2d 383, 386 (10th Cir. 1984).

6. Regarding the prima facie case, Beech raises no issue with the first two elements: participation in protected activity and adverse action contemporaneous to the protected activity. The court finds plaintiff participated in protected activity by giving a statement to an EEOC investigator. The adverse action, her termination, was eighteen days after the protect-

ed activity; the court concludes this time sequence is sufficiently contemporaneous.

7. Beech challenges the third element of the prima facie case: a causal connection between plaintiff's protected activity and Beech's decision to terminate plaintiff. Beech argues causation is lacking because the persons' who terminated plaintiff (Robinson and Jordan) were unaware of her protected activity; and the person who was aware of her protected activity (Long) did not participate in the decision to terminate plaintiff. Dkt. No. 35 at 15–16. The Tenth Circuit, faced with an identical argument by the defendant, explicitly reserved the question in *Anderson.* 861 F.2d at 635 ("Assuming, without deciding, that a plaintiff must show that the individual who took the adverse action against him knew of the employee's protected activity,....") & n. 3.

8. The court's initial response is that Beech's complaint about a lack of a prima facie case is inappropriate at this juncture. The court is in agreement with the *Aikens* Court:

> Because this case was fully tried on the merits, it is surprising to find the parties and the Court of Appeals still addressing the question whether Aikens made out a *prima facie* case. We think that by framing the issue in these terms, they have unnecessarily evaded the ultimate question of discrimination *vel non.* ...
>
> But when the defendant fails to persuade the district court to dismiss the action for lack of a prima facie case, and responds to the plaintiff's proof by offering evidence of the reason for the plaintiff's rejection, the fact finder must then decide whether the rejection was discriminatory within the meaning of Title VII.

460 U.S. at 714, 714–15, 103 S.Ct. at 1481, 1481–82 (footnotes omitted). The court in this instance did not grant a directed verdict at the close of plaintiff's evidence and heard all of Beech's evidence. Under *Aikens,* the court then must decide the ultimate fact question: Is Beech's reason for terminating plaintiff pretextual or a legitimate, nondiscriminatory reason? The court determines that to argue about a prima facie case after the case is fully tried

is not helpful in resolving the key factual issue.

9. Alternatively, assuming the Tenth Circuit will engraft a knowledge requirement on the causal connection prong of the prima facie case, the court finds this prerequisite is met. Like this case, defendant's personnel in *Anderson* who made the employment decisions denied any knowledge of the protected activity. The Tenth Circuit imputed knowledge to them despite their denials under the following circumstances:

> the jury could have inferred that they were aware of the charge if it believed testimony of the supervisor of the central clearing house functions in Bartlesville under the transfer policy *that he sometimes communicated adverse job-related information by telephone after he forwarded an employee's name and work history to the hiring locations.* The supervisor testified that he was aware of Mr. Anderson's age discrimination charge at the time of the refinery closing.

*Anderson,* 861 F.2d at 635 (emphasis added). Without any direct testimony to rebut the denials of knowledge by defendant's relevant agents, the Tenth Circuit found the probability that knowledge could have been transmitted sufficient to meet the third element of the prima facie case.

10. Under the Tenth Circuit's analysis in *Anderson,* the court concludes the persons' who terminated plaintiff, Robinson and Jordan, had sufficient knowledge of plaintiff's protected activity. Robinson had ultimate control over plaintiff's and Stevens' terminations. Robinson exhibited considerable animosity against plaintiff during his testimony because of her frank comments about Beech supervisors. Robinson, because of his involvement in past termination meetings with Stevens, was no doubt aware that plaintiff had not provided Beech with the written complaint against Stevens that Beech wanted. The first concern plaintiff raised to the EEOC investigator in the Stevens matter was her fear of retaliation by Robinson and Shelden. The EEOC investigator interviewed Robinson

and Shelden about Stevens' termination *after* he talked with plaintiff. The court draws the reasonable inference that the EEOC investigator raised this point with the management pair, even though Long's sketchy notes do not record this line of questioning.

Robinson and Shelden could have learned of plaintiff's testimony in another way. Within three days of the EEOC interview, Beech and Stevens began negotiations to settle his claim. The court understands that Beech would not want to settle a case if it had strong reasons to terminate someone. Robinson or Shelden, the director of personnel, could learn directly from the scope of the settlement talks or from their very existence that plaintiff had not offered strong testimony for Beech. For the above reasons, the court determines the causal connection element of the prima facie case is met.

■ 11. The court turns next to the key factual issue of whether the main reason given for plaintiff's termination, her rudeness in answering RSVP phone calls, was pretextual. After a careful review of the evidence, the court concludes the proffered reason was pretextual. First, the rudeness charge is not supported by credible evidence. The only person to *observe* plaintiff's phone demeanor and give a detailed *description* of it did not conclude plaintiff acted rudely. Osment heard plaintiff answer the phone, discerned some trouble from the tender of plaintiff's half of the conversation, asked plaintiff what the difficulty was and concluded she was curt but not rude. By contrast, plaintiff's accusers gave vague generalizations about her conduct or did not witness her phone conduct. Both Condiff and Pendergraft claim they saw plaintiff acting rude but state nothing more than this conclusion; they give no examples or descriptions. They also do not state she should be terminated for her rudeness. Hutchinson, the main witness on this point, never saw or heard plaintiff take a call. She surmised plaintiff was the person the four callers complained about in the first three of the four complaints. Moreover, the memoranda Beech relied on

to document the rudeness charge gave off the odor of post hoc rationalizations; they are either nonspecific, Long memo, Def.Ex. No. 152, or written by a witness, Hutchinson, the court found lacked credibility.

12. Second, the court's pretext conclusion is supported by the failure of *any* Beech supervisor to *contemporaneously* confront plaintiff with the perceived problem of rudeness on the telephone. Three of plaintiff's supervisors, Condiff, Pendergraft and Hutchinson, knew she was rude to RSVP callers but did not view the problem as serious enough to warrant some immediate disciplinary or corrective action, the court cannot find that a month later her telephone rudeness was a legitimate reason to terminate her. The disparity in disciplinary action by Beech before the protected activity and after create a strong inference the later reason was pretextual.

13. The court's reasoning is reinforced by the type of problem plaintiff allegedly caused and the supervisors' knowledge of plaintiff's problems. A simple instruction from a supervisor to plaintiff to alter her tone or manner could have solved the problem Beech considered so egregious a month later. No supervisor had to draft a memo or take extensive corrective action; a few simple oral or written instructions would likely suffice. Also, this was not a case where the supervisors did not know about the situation or could not easily figure it out. Without knowledge of a problem, supervisors cannot take contemporaneous action to halt it or cure it and drastic action at a later date when the problem is discovered may be more understandable. The court would view the situation differently if numerous Beech supervisors had not expressed their considerable awareness of the alleged problem or had discussed the problem with plaintiff when it occurred.

14. Third, the court considers important the brusque disciplinary treatment plaintiff received in December, after her protected activity, in comparison to her treatment in February and Stevens' treatment in February and March. Evidence of different treatment after protected activity is probative of pretext. *Grant v. Bethleham Steel*

*Corp.,* 622 F.2d 43, 46–7 (2d Cir.1980). In February, Robinson perceived that plaintiff insulted a supervisor and he wanted to terminate her immediately. However, Beech did not terminate her: it suspended her without pay, investigated allegations of her misconduct, vailidated plaintiff's testimony about Stevens' indiscretions and allowed her to return on the condition she would improve her performance. In December, Beech did not tell her of the investigation, gave her a perfunctory chance to respond to the charges and summarily dismissed her in the next breath at the December 20 meeting. She was neither allowed to mount a defense nor received a second chance to improve her performance. The contrast with the treatment of Stevens is equally great: he received notice of the investigation; he could respond with rebuttal information; and he was suspended for a significant period of time prior to termination. Plaintiff received none of these considerations.

15. The court is not creating a rule that all employees must be terminated in the same manner absent an employment contract; the court recognizes that conditions and circumstances may vary. Nonetheless, this case has two disciplinary actions against plaintiff within one year; one on either side of her protected activity. Plaintiff's behavior in the first incident caused her supervisor to call for her immediate firing while the later incident caused no supervisor to take any disciplinary action until several weeks later. The disparate treatment in these two incidents further supports the court's holding that plaintiff's termination was pretextual.

16. Plaintiff's termination memo lists an additional reason for her discharge relating to her February 1983 misconduct: the suspension for making false or malicious statements about supervision and the reinstatement memo. Def.Exs. Nos. 122, 104 & 107. The court considers this rationale also pretextual. Beech did not substantiate the falseness of plaintiff's alleged statements at any time. Beech's reference to the reinstatement memo is a makeweight argument for several reasons. Beech failed to comply with the agreement to provide plaintiff with monthly meetings to assess plaintiff's progress in meeting the reinstatement conditions. Shelden and Robinson testified that plaintiff met the terms of the reinstatement memo. The court concludes this additional ad hoc rationalization is insufficient to defeat the clear imprint of pretextual decision making.

17. Beech also argues that the termination was not pretextual because plaintiff had not previously given testimony favorable to Beech. Dkt. No. 34 at 6. Beech, therefore, had no expectation she would enhance their case against Stevens and could not have fired her for the alleged illegal reason. The court does not find this argument persuasive. Beech's point is in essence that if we did not discriminate the first time we had the opportunity to we must not have the second time. This argument does not take into account the cumulative effect of plaintiff's "failure to cooperate" and the importance of her EEOC testimony in the settlement of Stevens' suit. The court concludes the facts and inferences from the facts points the other way. Beech, when faced with an employee who did not buttress their case before a government investigation, took action against the employee.

## B. IMPLIED EMPLOYMENT CONTRACT

18. The court next considers plaintiff's contention that her firing was a breach of an implied employment contract. The Kansas Supreme Court recently reaffirmed the standards governing the issue:

'Where it is alleged that an employment contract is one to be based upon the theory of "implied in fact," the understanding and intent of the parties is to be ascertained from several factors which include written or oral negotiations, the conduct of the parties from the commencement of the employment relationship, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment and any other circumstances surrounding the employment relationship which would tend to explain or make

clear the intention of the parties at the time said employment commenced.'

*Morriss v. Coleman Co., Inc.,* 241 Kan. 501, 513, 738 P.2d 841, 849 (1987) (quoting *Allegri v. Providence–St. Margaret Health Center,* 9 Kan.App.2d 659, Syl. § 5, 684 P.2d 1031 (1984)). An explicit disclaimer in the employee handbook does not automatically prevent a finding of an implied contract. *Morriss,* 241 Kan. at 514, 738 P.2d at 849. The *Morriss* court refused to imply a covenant of good faith and fair dealing in every employment contract. 241 Kan. at 514–18, 738 P.2d at 849–51.

19. All of the decisions found on this issue resolve whether sufficient evidence exists for the implied contract claim to survive summary judgement; no opinion reports a decision by a factfinder on this question. *Conaway v. Smith,* 853 F.2d 789, 793–94 (10th Cir.1988); *Johnson v. City of Wichita,* 687 F.Supp. 1501, 1507–08 (D.Kan.1988); *Boyd v. Doskocil Sausage Co.,* 686 F.Supp. 875, 877–78 (D.Kan.1988); *Laughlin v. Board of County Commissioners of Johnson County,* 647 F.Supp. 937, 940–41 (D.Kan.1984); *Kistler v. Life Care Centers of America, Inc.,* 620 F.Supp. 1268, 1270 (D.Kan.1985); *Fletcher v. Wesley Medical Center,* 585 F.Supp. 1260, 1263–64 (D.Kan.1984). The summary judgment rulings provide little guidance for this court's decision on the merits.

20. Plaintiff argues numerous facts demonstrate an implied employment contract. Dkt. no. 30 at ¶ 20; Dkt. no. 31 at 3. First, she points to her nine years of discipline-free employment and consistently high marks for job performance. This evidence proves Beech considered her a good worker and perhaps that good workers do not get terminated, a possible axiom in an employment-at-will situation. It does not demonstrate a contract provision on when termination is permitted or what are proper pre-termination procedures. Second, plaintiff relies on Shelden's and Robinson's testimony that Beech had a "fairness policy" to its employees. The testimony of Shelden and Robinson put little flesh on this vague policy. The court cannot find that it contributes much to an implied understanding of Beech's termination policy.

21. Plaintiff relies heavily on the employee handbook for its argument. The handbook retains Beech's right to take what ever discipline it deems appropriate for any conduct; the discipline outlined for each type of conduct listed is advisory, not mandatory. Even with the "fairness doctrine" statements of Shelden and Robinson, the court cannot conclude the handbook creates a termination policy only "for good cause." The handbook simply does not lend itself to that construction. The handbook has *no* language to support a "good cause" standard. The handbook has no grievance procedure which might lead to an inference of good cause terminations. Contrary to plaintiff's contention, Rule 18 of the handbook, which sets out the suggested discipline for an employee's failure to cooperate with an investigation, does not create a grievance procedure by implication. Plaintiff's interpretation of Rule 18 finds no support in the text. Without any language or structure in the handbook to limit Beech's traditional, unfettered right to discipline employees as it sees fit, the court finds no support for an implied employment contract in the handbook.

22. Plaintiff's next claim for finding an implied contract is in Beech's manner of disciplining her and Stevens. In February 1983, Beech suspended plaintiff and Stevens and placed both under investigation for offenses the handbook suggested could result in their termination on the *first* offense. This treatment is much different than plaintiff received in December. While different discipline for similar conduct tends to show discrimination, it does not evince an employment contract of any sort. A key inquiry for finding an implied contract is a pattern or practice of acting in a similar situation. Two similar acts, plaintiff's and Stevens' disciplinary treatment in February, do not rise to the level of a practice. Plaintiff offered no testimony or documents beyond the handbook to show that Beech generally disciplined or investigated employees in any particular manner. The court is unwilling to extrapolate from these limited incidents before it to an im-

plied contract with Beech employees on termination and pre-termination investigation policy.

23. Plaintiff's last contention is that her conditional reinstatement is probative of an implied contract. Def.Ex. No. 107. The document itself is an express contract for six months, not an implied contract; it expressly states that plaintiff will retain her job if she meets several enumerated criteria. *Id.* As Shelden and Robinson testified, the conditional reinstatement period finished in August. Plaintiff was not under the reinstatement document when Beech terminated her.

Plaintiff's argument may be that Beech's decision to provisionally reinstate her evinces an implied contract. The court cannot concur. Plaintiff produced no evidence, other than her own example, of a policy, practice or promise to her to discipline and reinstate employees in the manner she was in February.

24. The court realizes that with a complex factual question, like an alleged implied employment contract, the factfinder cannot wear blinders and examine each piece of evidence in isolation and then move on to the next piece. While rigorously examining each assertion, the court must examine the entire situation. The court has undertaken this larger task and can perceive nothing to alter its judgment that plaintiff and Beech did not have an implied employment contract.

## C. DAMAGES

25. Plaintiff requests reinstatement, back pay, fringe benefits, exemplary damages, an injunction and attorney fees. The court has the power to provide "the most complete relief possible" to eliminate the effects of the discriminatory act violating Title VII. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975); 42 U.S.C. § 2000e–5(g). The court will consider plaintiff's damage requests.

26. The court finds that reinstatement would not be proper. First, plaintiff did not request reinstatement in the pretrial order. Dkt. No. 20 at 11. This omission does not preclude the court from awarding reinstatement. *Whatley v. Skaggs Companies Inc.,* 707 F.2d 1129, 1137 (10th Cir.1983), *cert. denied,* 464 U.S. 938, 104 S.Ct. 349, 78 L.Ed.2d 314 (1983). The court, however, does view it as probative of the proper scope of relief. Second, plaintiff gave no testimony about her desire to return to Beech. The Tenth Circuit recently denied a claim for reinstatement when the dismissed employees did not offer testimony of their desire to return to their prior positions. *E.E.O.C. v. General Lines, Inc.,* 865 F.2d 1555, 1561–63 (10th Cir.1989). Third, the court determines plaintiff's reemployment at Beech would create some hostility. *See Id.* at 1563–64.

27. Plaintiff's backpay award is limited to the year 1984. From her testimony and documentary evidence, Def.Ex. No. 152, the court determines plaintiff would have stayed at Beech for the better part of 1984 —or until her pension vested and she had time to secure other fulfillment. After Beech eliminated her aviation education specialist position, plaintiff expressed no desire to stay with Beech beyond the April date of her pension vesting. The court concludes that back pay for the entire year is sufficient to compensate her for the retaliatory discharge.

Her damages for 1984 are $16,949. She would have earned $19,718 if employed in the secretarial position. The court will subtract her interim earnings of $2,769 to reach her total for the year. The court will not subtract her unemployment compensation earnings. *Whatley,* 707 F.2d at 1138 (trial court has discretion on whether to subtract unemployment benefits from a backpay award). A statutory benefit to plaintiff should not reduce the judgment against defendant for its wrongful conduct.

28. Consistent with the court's determination to allow damages for the year 1984, the court will order Beech to grant plaintiff pension benefits reflecting her employment for the entire year of 1984.

29. Plaintiff will not receive exemplary damages. *Pearson v. Western Electric Co.,* 542 F.2d 1150, 1152 (10th Cir.1976).

30. Plaintiff requests an injunction that Beech 1) comply with Title VII and 2) tell all its employees their rights under Title VII. Plaintiff has presented no facts to support this request and it is denied.

31. Plaintiff's counsel is entitled to attorney fees. 42 U.S.C. § 2000e–5(k).

IT IS BY THE COURT THEREFORE ORDERED that judgment is entered for plaintiff for $16,949 and pension benefits reflecting her employment through December 31, 1984, based on plaintiff's Title VII claim. IT IS FURTHER ORDERED that plaintiff's counsel shall submit an application for attorney fees within thirty days, response within fifteen days and a reply within five days. IT IS FURTHER ORDERED that judgment is entered for defendant on plaintiff's implied contract claim.