**Carol L. PEGG, Plaintiff,**

v.

**GENERAL MOTORS CORPORATION, Defendant.**

No. 88–4267–C.

United States District Court, D. Kansas.

Feb. 10, 1992.

Kevin M. Fowler, Frieden, Haynes & Forbes, Topeka, Kan., for plaintiff.

Stephen A. Murphy, Paul Scott Kelly, Jr., Gage & Tucker, Overland Park, Kan., John

J. Yates, Gage & Tucker, Kansas City, Mo., for defendant.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on the defendant's motion for summary judgment. The plaintiff, Carol Pegg ("Pegg"), was employed by the defendant, General Motors Corporation ("GMC"), until her termination in December of 1986. The plaintiff alleges she was denied certain benefits and was terminated in breach of an implied contract and, alternatively, an express contract, and in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623 and 626(c), and the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e–2 and 2000e–5(f)(1). The defendant contends summary judgment should be entered on each of the plaintiff's claims.

A motion for summary judgment gives the judge an initial opportunity to assess the need for a trial. Without weighing the evidence or determining credibility, the court grants summary judgment when no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–252, 106 S.Ct. at 2512.

An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. at 2510. An issue of fact is "material" if proof of it might affect the outcome of the lawsuit. 477 U.S. at 249, 106 S.Ct. at 2510. Factual inferences are drawn to favor the existence of triable issues, and where reasonable minds could ultimately reach different conclusions, summary judgment is inappropriate. *See Riley v. Brown & Root, Inc.,* 896 F.2d 474, 476–77 (10th Cir.1990).

The movant's initial burden under Fed. R.Civ.P. 56 is to show the absence of evidence to support the nonmoving party's case. *Windon Third Oil and Gas v. Federal Deposit Ins.,* 805 F.2d 342, 345 (10th Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987). The movant must specify those portions of " 'the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits if any,' " which demonstrate the absence of a genuine issue of fact. *Windon,* 805 F.2d at 345 (quoting Fed.R.Civ.P. 56(c)). It may be sufficient for the movant to establish that the alleged factual issues are without legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.,* 812 F.2d 1319, 1323 (10th Cir.1987).

■ The opposing party may not rest upon mere allegations or denials in the pleadings but must set forth specific facts supported by the kinds of evidentiary materials listed in Rule 56(c). *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. The evidence is deemed true and all reasonable inferences are drawn in his favor. *Windon,* 805 F.2d at 346. More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed. R.Civ.P. 1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Though a court should be cautious to grant summary judgment in a discrimination case when intent is at issue, such motions are useful to weed out those claims and cases obviously lacking merit. *Summers v. State Farm Mut. Auto. Ins. Co.,* 864 F.2d 700, 709 (10th Cir.1988); *Schwenke v. Skaggs Alpha Beta, Inc.,* 858 F.2d 627, 628 (10th Cir. 1988). Plaintiff must come forth with specific facts to show a genuine issue of material fact; mere assertions or conjecture as to intent or pretext is not enough to survive summary judgment. *Branson v. Price River Coal Co.,* 853 F.2d 768, 771–72 (10th Cir.1988).

For purposes of this motion, the court will accept the following facts as uncontroverted:

1. The plaintiff was first hired by GMC on January 16, 1969, to work as a third-level position clerk in the Chevrolet Motor Division in Omaha, Nebraska. As of October 1, 1977, she had received four promotions and was serving in the position of district manager in the Denver Zone. After several transfers, she was relocated to Salina, Kansas, to serve as a district manager within the Kansas City Zone.

2. Whenever the plaintiff received a salary increase from GMC, she received a written compensation statement which she signed and which referred four different times to an "Employment Agreement" between her and GMC. One such reference reads: "When signed and accepted, this statement, for the effective period hereof, becomes a part of my basic 'Employment Agreement,' in accordance with the terms thereof, as heretofore executed and presently in effect." The plaintiff never executed a written employment contract with GMC.

3. Salaried employees were given a handbook entitled "Working with General Motors." Outlined at page four of the 1985 version of the handbook is the different types of employment status available at GMC. The category for regular employee reads in pertinent part: "As a regular employe your employment is on a calendar month-to-month basis." At the end of the 1985 booklet, the following appears:

> While the policies and procedures in the booklet do not constitute a legal contract, and do not modify the month-to-month employment relationship (which in fact may not be altered, amended or extended by any employe, representative or agent of GM) described on page 4, GM does believe they represent a good basis for a productive relationship between you and GM.

The plaintiff recalls that the handbooks were distributed to the employees and were reviewed by the management with them.[1] The plaintiff denies that GMC ever informed her that employment was on a month-to-month basis.

4. In the early 1980's, GMC announced that due to increased competition nationwide and GMC's recent loss in profits it would reduce its salaried workforce and develop a reorganizational effort that would accomplish, in part, a streamlined administrative organization.

5. Prior to May of 1984, the Chevrolet Motor Division, as part of its policy on salaried employees' transfers, had the management inquire of employees regarding their willingness to travel and relocate. In December of 1982, the plaintiff wrote a memo to her zone manager stating: "I do not feel that I am in a position to leave myself open for a relocation...." Later in the same memo, she said: "The above does not mean I would not relocate should the District Sales Manager position be eliminated...."

6. The Chevrolet Motor Division announced in May 1984 a new relocation policy. Since the past policy had "created bottlenecks" which interfered with management's ability to place according to business needs, the new policy was less concerned with an employee's choice:

> Accordingly, you will no longer be asked to indicate in advance your willingness to travel and relocate. While management will continue to be aware of employe concerns about relocation, after August 31, 1984, business considerations as determined by management, will be given first priority. All Sales, Marketing, and Service employes will be expected to relocate when required by management.

> Failure or refusal to accept an assignment, for reasons unacceptable to management, will result in a Special Separation.

---

1. Plaintiff testified that some statements in the same handbook partially comprise her implied contract for continued employment with GMC. For this reason, the plaintiff's inability to recall exactly when she received this handbook does not raise a genuine issue of fact. The court will not permit the plaintiff to avoid summary judgment by changing her position on whether she relied on this particular handbook whenever it suits her and her case.

In exceptional cases, exemption from transfer and/or relocation may be requested on a "deferral" arrangement and may be granted if, in management's judgement, the circumstances justify deferral.

The plaintiff was asked to sign a form acknowledging her receipt of these changes in the relocation policy. The plaintiff first signed with a notation at the bottom that her earlier stated position on transfers had not changed. The plaintiff was then told that she would be terminated if she did not sign the acknowledgement without comment. The plaintiff then executed another acknowledgement of receipt.

7. A memorandum dated August 25, 1986, from the Office of the General Manager was sent to all Chevrolet salaried employees telling them that GMC had announced two corporate-wide voluntary programs—Special Retirement Program for "selected employes aged 53 through 59" and Special Separation Incentive Program ("SSIP") for "selected employes under 53"—to assist Chevrolet in reducing its salaried work force. The memorandum further provided:

> Both of these programs would involve employes whose departure is mutually agreed upon between the individual and the employing unit.
>
> . . . .
>
> Salaried employes selected for separation under these programs will be contacted on an individual basis, and details of these programs will be made available at that time.

The plaintiff received and reviewed this letter.

8. On September 30, 1986, the plaintiff received and reviewed a two-page memorandum entitled "Separation Program for Regular Salaried Employes." Towards the front of the memorandum appears: "Both of these programs would involve employes whose departure is mutually agreed upon

between the individual and the employing unit." Among the "General Provisions" appears: "The program will be administered on a mutually agreeable basis to both management and the employe. An employe may volunteer for the separation offer or the separation can be initiated by management."

9. Also on September 30, 1986, the plaintiff attended a satellite broadcast on GMC's reorganization plans and programs. After the broadcast, Eldon Kibler, the Kansas City Zone Manager, addressed the employees in attendance. Kibler told the employees that as a result of the reorganization they had three options: (1) take early retirement if eligible; (2) take the "Golden Handshake;"[2] or (3) take the transfer. At a break, the plaintiff told Kibler she wanted the Golden Handshake. Kibler congratulated her and said: "You have it." Later the same day at Kibler's office, the plaintiff agreed to a separation day effective October 15th. Kibler told plaintiff that he was unable to reach by telephone the proper people in Detroit to convey the necessary information. Kibler also asked plaintiff to put her request for SSIP in writing.

10. The defendant's practice was to require approval of the Chevrolet Central Office in Warren, Michigan before a Chevrolet employee could be offered or awarded the SSIP.[3]

11. The plaintiff signed a letter dated September 30, 1986, addressed to Kibler, that stated in part: "Kindly consider this a request to receive the Special Incentive Separation as described in the 'Separation Program for Regular Salaried Employes' handout." The letter also stated the plaintiff's understanding of what benefits would be due her under the SSIP.

12. The plaintiff was aware that GMC had the ability to and, in fact, had on occasion unilaterally changed its policies including those affecting the plaintiff.

---

**2.** The "Golden Handshake" is the term used by Chevrolet employees in referring to the Special Separation Incentive Program ("SSIP").

**3.** Plaintiff has not controverted this fact. The communications and example cited by plaintiff

only show the offers were extended by a zone manager and do not establish that the decision to offer or a decision to later approve was not made by the Central Office. Nor does plaintiff's understanding of the policy controvert this fact.

Nonetheless, the plaintiff does not believe that GMC could change the transfer/relocation policy as to her after she had stated her position in writing.

13. The plaintiff knew that a zone manager did not have the authority to change GMC's policies. The plaintiff believed that a zone manager, because of his title and position, could fire her without the approval. The plaintiff did not know if the zone manager could increase her pay without the approval of other management. The plaintiff believed Kibler could agree on behalf of GMC to award SSIP to an employee. She held this belief, in part, because of what Kibler had said to her on September 30th in regards to the satellite broadcast and to her eligibility for the SSIP.

14. The plaintiff's request for SSIP was denied by the Central Office in Warren, Michigan, in the middle to latter part of October. The apparent reason was that only employees in closing branches were being considered for SSIP.

15. As part of the reorganization, Chevrolet phased out the position of district sales manager as of December 1, 1986. Three male district sales managers in the Kansas City Zone were transferred to the Marketing Center in Warren, Michigan, and their positions were not available until June 18, 1987. After December 1, 1986, and until their transfer, these district sales managers performed some of the plaintiff's former responsibilities.

16. The plaintiff was assigned to report on December 1, 1986, to the New York Branch of Chevrolet Motor Division. The plaintiff failed to appear at her assignment and was terminated.

## BREACH OF CONTRACT

### A. *Implied Contract*

In the pretrial order, the plaintiff alleges that she had an implied contract with GMC on the duration and place of her employment. The essential terms of this alleged contract were that the plaintiff would be allowed to remain a GMC employee residing in Salina, Kansas, until her retirement at age 65 so long as she satisfactorily performed her work, and/or that GMC would not transfer the plaintiff without her consent to any position that would require her to relocate from Salina. The plaintiff alleges the defendant breached this implied contract when it terminated the plaintiff for refusing to accept the transfer to New York.

In 1987, the Kansas Supreme Court recognized that the force of the employment-at-will doctrine had been eroded by several recent trends in the law. *Morriss v. Coleman Co.*, 241 Kan. 501, 738 P.2d 841 (1987). Relevant here is the trend of the courts "to interpret employment contracts more broadly and to recognize an implied obligation on the part of the employer not to terminate an employee arbitrarily where a policy or program of the employer, either express or implied, restricts the employer's right of termination at will." 241 Kan. at 509, 738 P.2d 841. The Supreme Court cited and followed the general rule adopted by the Kansas Court of Appeals in *Allegri v. Providence–St. Margaret Health Center*, 9 Kan.App.2d 659, Syl. ¶ 5, 684 P.2d 1031 (1984):

Where it is alleged that an employment contract is one to be based upon theory of 'implied in fact,' the understanding and intent of the parties is to be ascertained from several factors which include written or oral negotiations, the conduct of the parties from the commencement of the employment relationship, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment, and any other circumstances surrounding the employment relationship which would tend to explain or make clear the intention of the parties at the time said employment commenced.

*Morriss*, 241 Kan. at 513, 738 P.2d 841. The Kansas Court of Appeals couched this rule in the fundamental contract concepts of parties becoming contractually obligated by nonverbal conduct and of an agreement arising from a mutual intent and not a subjective intent. 9 Kan.App.2d at 664,

684 P.2d 1031.[4] Because it is the established rule that the intent of contracting parties is generally a question of fact, the determination of an implied contract is principally a factual inquiry into all relevant circumstances of the plaintiff's employment. *See Brown v. United Methodist Homes for the Aged,* 249 Kan. 124, 134, 815 P.2d 72 (1991); *Hahn v. International Paper Co., Inc.,* No. 90–2208–V, 1991 WL 269000, 1991 U.S. Dist. LEXIS 17701 (D.Kan. Nov. 12, 1991). The bottom line question is whether a reasonable jury could find from the evidence that the parties bargained for the alleged contract. *See Koopman v. Water Dist. No. 1 of Johnson County,* No. 88–2573–V, 1991 WL 50092, 1991 U.S. Dist. LEXIS 4569 (D.Kan. Mar. 26, 1991).

█ The defendant first argues the plaintiff had an express month-to-month employment arrangement with GMC thereby foreclosing any possibility of an implied contract with inconsistent terms. *See Marsh v. Coleman Co., Inc.,* 774 F.Supp. 608, 615 (D.Kan.1991). In support, the defendant points to the employee handbook and compensation statements signed by the plaintiff. The employee handbook expressly disclaims that it constitutes a legal contract. The compensation statements refer to an "Employment Agreement ... as heretofore *executed* and presently in effect." (Emphasis added). The plaintiff never executed a written employment contract. The plaintiff denies that she entered into a month-to-month contract with GMC. Consequently, it is a controverted fact issue whether the parties entered into an express month-to-month employment contract.

█ The defendant next contends that the factual basis of the plaintiff's implied contract is insufficient to sustain a jury

verdict in her favor. The plaintiff points to a number of circumstances to support her claim. She completed a probationary period and became a career employee. She retained her job despite numerous lay-offs and reductions-in-force at GMC. She was promoted several times. She was assured job longevity and security through numerous handbooks, manuals and management presentations. She received career planning guidance and on-the-job training. Her performance was appraised favorably and earned her several awards. Salary raises including merit pay increases were given to her. She received annual benefit summaries that calculated benefits on the assumption of her retirement at age 65. She worked for GMC for seventeen years and eleven months.

In relying on the above circumstances, the plaintiff loses sight of the alleged terms to her implied contract. None of these general circumstances evidences a mutual intent that the plaintiff could remain in Salina until her retirement or that she would not be transferred without her consent. This is not to say that the plaintiff is without any evidence for her claim.

█ She asserts that her timely written election in December 1982 was final and binding on GMC and that GMC's unilateral change in policy was without force to her. The plaintiff's memo does not evidence an agreement that she could retire in Salina or that her transfer was conditioned on her consent. In fact, the plaintiff agreed in the letter that she would transfer in the event that her position was eliminated. Because her transfer in December of 1986 was for that very reason, the plaintiff cannot allege a breach of any implied contract created by her memo of December of 1982.[5]

---

**4.** A mutual intent to contract must be shown for an implied contract in fact to exist. *Atchison County Farmers Union Co-op Ass'n v. Turnbull,* 241 Kan. 357, 363, 736 P.2d 917 (1987).

**5.** The court also finds no evidence to show that defendant intended to except plaintiff from the relocation policy put into effect in September 1984. There is no evidence that defendant intended to be bound by the plaintiff's election in

1982 for however long that plaintiff remained with Chevrolet. Plaintiff's election was simply part of the annual interview process, and the fact that plaintiff chose to express her election in terms of indefinite length does not show that defendant intended to be bound by it for the same length of time. Moreover, the defendant unilaterally changed its relocation policy and required the plaintiff to acknowledge receipt of this policy change. Plaintiff has not come forth

The plaintiff also asserts that sometime in January of 1985 she told Kibler, the new zone manager, about her concerns about being transferred under the new relocation policy. The plaintiff says that Kibler then told her that she could retire in Salina, Kansas, as long as she continued her good performance. The court believes a reasonable jury could not find an implied contract on the weight of this circumstance alone or in combination with the other circumstances. The plaintiff testified in her deposition that she knew a zone manager did not have the ability to change a GMC policy. Therefore, it is not reasonable for the plaintiff to believe that Kibler had the authority to change a GMC policy so as to exclude her from its reach. In addition, the employee booklet, upon which the plaintiff relied in part for her implied contract claim, clearly states that her employment with GMC was strictly month-to-month and that this employment relationship could not be "altered, amended or extended by any employee, representative or agent of GM." The defendant is entitled to summary judgment on the plaintiff's implied contract claim.

### B. *Express Contract*

In the pretrial order, the plaintiff alternatively claims that on or about September 30, 1986, the defendant, acting through Kibler, offered the plaintiff the SSIP and she accepted. She alleges the defendant has breached this express agreement in not paying the sums due her under the SSIP. In its original motion, the defendant argued summary judgment should be granted for Kibler lacked actual and apparent authority to bind the defendant on SSIP. By leave of the court, the defendant filed a supplemental memorandum contending the plaintiff's express contract claim was preempted by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 *et seq.* ("ERISA"). The plaintiff concedes the preemption argument and

asks the court for leave to amend the pretrial order to recharacterize her express contract claim as an ERISA claim. The court grants the plaintiff's request for leave to amend.

Having assumed that the plaintiff would be allowed to assert her ERISA claim, the defendant also argues in its supplemental memorandum that summary judgment should be granted. Reading the plan to give the administrator the discretionary authority to determine eligibility for SSIP, the defendant argues the decision denying SSIP to the plaintiff must be upheld unless found to be arbitrary and capricious. In the defendant's opinion, the uncontroverted evidence shows that Kibler did not have actual or apparent authority to award SSIP to the plaintiff without the central office's consent. Defendant also maintains the plaintiff's evidence on this point is insufficient for a reasonable factfinder to return a verdict in her favor.

The plaintiff counters that the court should review *de novo* her denial of SSIP as the plan does not give GMC the discretion to interpret the terms of the plan. In the plaintiff's view, GMC's discretion under the plan to determine eligibility is immaterial, since the issue here is whether GMC, through Kibler, and the plaintiff mutually agreed that the plaintiff was eligible for and should receive the SSIP. The plaintiff finds nothing in the plan allowing GMC to reverse a binding award of SSIP by its management. The plaintiff argues questions of material fact exist regarding whether Kibler had the actual or apparent authority to award SSIP.

A person may bring an action under ERISA "to recover benefits due to him under the terms of this plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). This provision basically recognizes an ERISA "breach of contract" action. *Pratt v. Petroleum Prod. Mngmt.*

with any facts to show the defendant was without authority to change its relocation policy. The court finds no merit to plaintiff's duress argument. *See White v. General Motors Corp.,* 699 F.Supp. 1485, 1487 (D.Kan.1988). These

circumstances indicate nothing more than a unilateral expectation by plaintiff that she was not affected by the new relocation policy. *Conaway v. Smith,* 853 F.2d 789, 793 (10th Cir. 1988).

*Employee Sav. Plan,* 920 F.2d 651, 658 (10th Cir.1990). In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 111, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1988), the Court held "that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or the fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."

■ As characterized by her in the supplemental response brief, the plaintiff's ERISA claim solely alleges that her rights under the plan were breached when defendant denied her SSIP instead of honoring the agreement reached between her and Kibler. In other words, the plaintiff contends that the eligibility determination was made by Kibler for GMC and that GMC then breached the agreement by not paying the benefits and reversing its eligibility determination despite having no discretion nor authority to do so. The court believes the plaintiff's claim calls for a *de novo* review. Though giving the defendant discretion to decide eligibility, the plan says nothing about the defendant having the authority to interpret the written terms of the plan. The court finds that the plaintiff's ERISA claim turns not only upon an interpretation of the plan but on the factual issue of Kibler's apparent authority. Both issues will be decided by the court *de novo.*

■ The court believes the plaintiff's claim requires interpreting the plan. What GMC positions constitute "management" or "employing unit?" The plan does not define either term, and the court believes both, individually and together, are reasonably susceptible to more than one interpretation. The court does not find it plain and unambiguous that only the defendant's central office constitutes management. The interpretation of an ambiguous term is generally a question of fact decided upon competent evidence concerning the intention of the employer and the benefi-

ciaries, such as past interpretations, past practices, and customary usage. *Taylor v. Continental Group,* 933 F.2d 1227, 1232 (3rd Cir.1991). Consequently, if the factfinder construes the term "management" and "employing unit" to include the zone manager position, then Kibler may have had express authority under the plan to award SSIP to the plaintiff.[6]

■ Alternatively, the plaintiff argues Kibler had the apparent authority of GMC to reach a mutual agreement over SSIP benefits. The party asserting an agency relationship has the burden of proving it with "clear and satisfactory evidence." *In re Branding Iron Motel, Inc.,* 798 F.2d 396, 401 (10th Cir.1986) (quoting *Rodgers v. Arapahoe Pipeline Co.,* 185 Kan. 424, 345 P.2d 702, 707 (1959)). What constitutes an agency and whether competent evidence reasonably tends to prove the agency relationship are questions of law. *Henderson v. Hassur,* 225 Kan. 678, 682, 594 P.2d 650 (1979). According weight to the evidence and resolving conflicts in the evidence remain functions for the finder of fact. *Id. See National Football Scouting v. Continental Assur. Co.,* 931 F.2d 646, 649 (10th Cir.1991) ("The question of agency, be it on the basis of actual authority or apparent authority is ordinarily a question of fact.")

■ "An ostensible or apparent agent is one whom the principal has intentionally or by want of ordinary care induced and permitted third persons to believe to be his agent even though no authority, either express or implied, has been conferred upon him." *Brown v. Wichita State University,* 217 Kan. 279, 287, 540 P.2d 66 (1975), *modified on other grds,* 219 Kan. 2, 547 P.2d 1015 (1976). Apparent authority stems from the actions or words of the principal. *Bucher & Willis Consulting Engineers v. Smith,* 7 Kan.App.2d 467, 470, 643 P.2d 1156 (1982) ("[T]he title conferred upon the agent by the principal is sufficient to constitute a representation

---

**6.** "It is an express agency if the principal has delegated authority to the agent by words which expressly authorize the agent to do a delegable act." *Shawnee State Bank v. North Olathe Industrial Park, Inc.,* 228 Kan. 231, 236–37, 613 P.2d 1342 (1980). Defendant's practice of requiring Central Office approval is also relevant to the issue of express actual authority.

of some authority.") As a doctrine, apparent authority is predicated on the theory of estoppel. *Brown,* 217 Kan. at 287, 540 P.2d 66. In fact, the Kansas Court of Appeals has treated the two concepts identically in requiring the party asserting apparent authority to show reasonable reliance on the alleged agency relationship and prejudice if the principal were now permitted to deny the agency relationship. *Bray v. Bayles,* 4 Kan.App.2d 596, 607–08, 609 P.2d 1146, *aff'd in part and rev'd in part,* 228 Kan. 481, 618 P.2d 807 (1980); *see In re Branding Iron Motel, Inc.,* 798 F.2d at 401. A person, lacking actual authority but having apparent authority, may subject the principal to the same liability on a contract that would be imposed if the contract had been actually authorized. Restatement (Second) of Agency § 159 comment c (1958); *see Ford v. Guarantee Abstract & Title Co.,* 220 Kan. 244, 268, 553 P.2d 254 (1976).

The plaintiff points to several facts to support her claim that Kibler had the apparent authority to award SSIP benefits. First, the plan provides that it "will be administered on a mutually agreeable basis to both *management* and the employe." (Emphasis added). The SSIP was described in a satellite broadcast on September 30, 1986. Before the broadcast that day, employees were given a letter that said: "Following the broadcast, you will have an opportunity to discuss the broadcast and these charts with your management." Kibler was the only representative of GMC management who addressed the Kansas City employees after the broadcast. Kibler was the top GMC official in the Kansas City Zone and had supervisory responsibility over GMC employees located in several states. After the broadcast, the plaintiff approached Kibler telling him that she wanted the SSIP benefit. At that time, Kibler told her: "You have it," and shook her hand. The plaintiff inquired what more needed to be done, and Kibler explained that he would simply relay certain employment details to the Central Office. Later that same day in Kibler's office, the plaintiff asked when the SSIP would be effective, and Kibler told her: "Let's make it right away." After discussing it further, they agreed on October 15, 1986. Kibler then asked the plaintiff to give him a letter saying that she wanted the SSIP in order that Detroit would not think that he had coerced her. Kibler next told her to go "do something" to "kill time" as he was having difficulty calling Detroit. The plaintiff asked for permission to tell the clerical office in the zone office that she was leaving and to say her goodbyes. Kibler responded that would be "perfectly fine." The plaintiff denies that Kibler at any time mentioned that the SSIP was conditioned upon approval by the Central Office. These facts create a material and genuine issue on apparent authority to be decided at trial.[7]

## AGE AND SEX DISCRIMINATION

■ After reading the plaintiff's contentions and the issues section in the pretrial order, the court believes her only discrimination claim is that the defendant "impermissibly terminated her employment because of her age and/or sex." Her other allegations only go to show the defendant's articulated reasons for her termination were pretextual. The defendant seeks summary judgment arguing the uncontroverted facts are that the plaintiff's district sales manager position was eliminated in Salina, Kansas, that the plaintiff failed to accept her transfer, and that her special separation or termination was consistent with the terms of the existing relocation policy.

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his ... compensation, terms, conditions or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1). The

---

7. These same facts also distinguish this case from the decisions cited by defendant, *Bair v. General Motors Corp.,* 895 F.2d 1094 (6th Cir. 1990); *O'Neill v. Delco Products Overseas Corp.,* No. 89–CV–60108–AA (E.D.Mich. May 16, 1988) (Magistrate's Report and Recommendation), *judgmt. entered,* (E.D.Mich. June 12, 1990); and *Valz v. General Motors Corp.,* No. 87–2098C(1), 1988 WL 182379 (E.D.Mo. Apr. 25, 1988), *aff'd,* 871 F.2d 1094 (8th Cir.1988).

ADEA proscribes the same practices of an employer that are motivated by age discrimination. 29 U.S.C. § 623(a)(1).

In the absence of direct evidence that the employer's motive was discriminatory, a Title VII plaintiff may prove discriminatory intent through the evidentiary scheme established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later refined in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1982).[8] First, the plaintiff must demonstrate by the preponderance of the evidence a prima facie case of discrimination, which generally entails:

(1) the plaintiff is within the protected group;

(2) the plaintiff was adversely affected (i.e. terminated) by the employer's decision;

(3) the plaintiff was qualified for and doing satisfactory work in her position; and

(4) circumstances existed from which an inference of discrimination can be drawn (i.e. persons outside the protected group replaced her or were treated more favorably).

*See Denison v. Swaco Geolograph Co.,* 941 F.2d 1416, 1421 (10th Cir.1991); *Branson v. Price River Coal Co.,* 853 F.2d at 770. The prima facie case is not an onerous burden but simply raises an inference of discrimination. If the plaintiff succeeds, the burden of production shifts to the defendant to rebut this inference of discrimination. Rebuttal is accomplished by disputing the plaintiff's evidence or by articulating a legitimate, nondiscriminatory reason for the disparate treatment of plaintiff. Though the defendant need not persuade the court that the proffered reason was the defendant's actual motive, the defendant's explanation must be clear and reasonably specific. If the defendant succeeds, the plaintiff must then show the defendant's reasons are a pretext for discrimination. This burden merges with the plaintiff's ul-

timate burden of persuading the court to find intentional discrimination. The plaintiff can meet this burden by directly showing the employer's actions were racially motivated or by showing the employer's reasons are without credence. *See Burdine,* 450 U.S. at 252–56, 101 S.Ct. at 1093–95; *Denison,* 941 F.2d at 1420–22; *Drake v. City of Fort Collins,* 927 F.2d 1156, 1160–61 (10th Cir.1991).

The defendant argues the plaintiff cannot prove a prima facie case. The transfer caused no adverse action to the plaintiff as she had already indicated her willingness to relocate in the event her position was eliminated. The plaintiff was not treated differently since all district manager positions in the Kansas City Zone were eliminated. This affected all district managers regardless of their age or sex. Other employees who refused to transfer either resigned or were terminated. Of this group, most were men and most were under age 40.

■ Plaintiff first responds that defendant has violated Fed.R.Civ.P. 56 and D.Kan.Rule 206 in not setting forth any statements of facts relating to the plaintiff's discrimination claims. The court agrees that defendant omitted from its initial statement some facts that are later argued in the memorandum. The court, however, will not deny defendant's motion on this ground, for the motions have been pending a significant period and the plaintiff was afforded adequate notice of the defendant's position and the facts at issue.

Instead of organizing and presenting what she believes is a prima facie case of discrimination on her termination, the plaintiff throws out a number of circumstances and observations which in her opinion sustain a reasonable inference of discrimination. The court does not share the plaintiff's opinion.

The plaintiff's evidence does not reasonably support the inference that her New York transfer would have been to a lower position level with reduced compensation. The plaintiff's argument in this regards is

---

**8.** The same indirect method of proving discrimination is applied to ADEA cases. *Branson v.*

*Price River Coal Co.,* 853 F.2d at 770.

little more than speculation. Nor can the plaintiff logically maintain the transfer as an adverse effect in itself for she had acknowledged long before a willingness to relocate if her position was being eliminated. Moreover, the plaintiff has no evidence to show that the defendant's decision to eliminate the district manager positions in the Kansas City Zone was discriminatory. For the plaintiff to remain with GMC, she must be transferred unless there was some position left for her in the Kansas City Zone.[9] The plaintiff has presented no evidence of an opening for her. This court also believes the six-month delay in transferring certain Kansas City Zone district managers to Michigan is not such favorable treatment which could sustain an inference of discrimination.[10] Nor has plaintiff shown that within GMC employment a transfer to Michigan was more favorable than a transfer to New York.

Assuming the plaintiff had presented a prima facie case of discriminatory termination, the court believes the plaintiff has wholly failed to show the defendant's articulated business reason for the termination was pretextual. Defendant's business decision was a simple matter of enforcing its relocation policy. Defendant transferred most of the district sales managers in the Kansas City Zone in December of 1986 and delayed the transfer of three others because their positions were not open or available yet. Defendant awarded SSIP to Mr. Jesina, the former assistant zone manager in Kansas City, before the program was even announced to the Chevrolet employees. In addition, Chevrolet decided to give Mr. Jesina the SSIP to assist him in opening and operating his new Chevrolet dealership. The affidavit of Margaret Fitzpatrick also reflects that twenty of the Chevrolet employees who requested and were denied SSIP also chose to resign rather than transfer. Of this twenty, sixteen were men and fourteen were under the age of forty. On these facts, no reasonable jury or judge could find that the plaintiff had been a victim of age or sex discrimination.

IT IS THEREFORE ORDERED that defendant's motion for summary judgment (Dk. 44) is granted as to plaintiff's claims of an implied contract, age discrimination and sex discrimination, and is denied as to plaintiff's claim of an express contract.

---

**9.** From confidential records submitted pursuant to a protective order, plaintiff adduces that a man working as a level six sales manager in another zone was transferred to New York in March of 1987 and failed to report as ordered. He was not immediately terminated but allowed to work for approximately forty-five more days and then to resign. The plaintiff has painted this scenario from vague employee payment records. The court does not believe this one instance reasonably sustains an inference of discrimination in how the plaintiff was treated in the Kansas City Zone. Besides not knowing what actually occurred in this comparative event, the court is concerned that the critical decisions there likely were made by different people under different circumstances. If resort to comparative events beyond the Kansas City Zone are appropriate, the affidavit of Margaret Fitzpatrick shows that five people, counting the plaintiff, were terminated for not accepting the transfers. Three of those were men, and all but the plaintiff were under 40.

**10.** Plaintiff's discrimination claims are not brought on this alleged adverse act. She seeks relief far in excess of six months of wages and the difference in benefits.